Argued and submitted December 5, 1983, affirmed September 5, 1984

# BROWN,
*Respondent on Review,*

*v.*

# J. C. PENNEY COMPANY, INC. et al,
*Defendants,*
SHIELDS et al,
*Petitioners on Review.*

(No. 78-8085; CA A22384; SC 29951)

688 P2d 811

George A. Burgott, Eugene, argued the cause for petitioners on review. On the briefs were Darst B. Atherly, Sandra K. Paulus, and Atherly, Butler & Burgott.

Daniel W. Goff, Eugene, argued the cause for respondent on review. With him on the brief was Goff & Smith.

LENT, J.

**LENT, J.**

The first issue is whether a computer printout was properly received in evidence over objection (1) that it was hearsay, (2) that it was not the original writings and no proper foundation was laid under former ORS 41.640(1)(e)[1] to receive the printout as a "summary" of the original writings, and (3) that it was not relevant. We hold that the trial court did not err in receiving the printout.

The second issue is whether there was evidence received from which the jury could have found that every element of plaintiff's cause of action was established. This issue is presented by the trial court's denial of defendants' timely motion for a directed verdict. We hold there was such evidence.

## I.

This is an action for damages allegedly resulting from negligence of defendants.[2] Defendants, other than Ellsworth, were the owners and operators in the City of Eugene of Valley

---

[1] At the time this cause was tried, ORS 41.640 and 43.370 were in effect. Both sections were repealed by Oregon Laws 1981, chapter 892, and replaced by the Oregon Evidence Code. Former ORS 41.640(1)(e) was concerned with the admissibility of a summary:

"(1) There shall be no evidence of the contents of a writing, other than the writing itself, except:

"* * * * *

"(e) When the originals consist of numerous accounts, or other documents, which cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole."

In *Shepherd v. Hub Lumber Co.*, 273 Or 331, 349, 541 P2d 439 (1975), this court referred to evidence admissible under that statute as a "summary."

The Oregon Evidence Code provides that it shall apply to "further procedure" in actions pending on January 1, 1982, unless application would not be feasible or would work an injustice. Or Laws 1981, ch 892, § 101. OEC 1006 provides:

"The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

[2] Defendants J. C. Penney Company, Inc., and May Department Stores Company were not parties on appeal of this case in the Court of Appeals and are neither petitioners nor respondents in this court. Reference in this opinion to "defendants" is reference to petitioners on review.

River Center (VRC), a shopping center comprised of numerous retail stores in a shopping mall surrounded by a parking lot. Defendants' answer admits that the lot was "operated, maintained and controlled" by the defendants "for the use and benefit of customers of" VRC.

On December 23, 1976, plaintiff, a customer, was attacked and robbed by a purse snatcher in the lot, resulting in serious physical injuries to plaintiff. Her action is purportedly based on the rules of law expressed in 2 Restatement (Second) of Torts, § 344:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> "(a)  discover that such acts are being done or are likely to be done, or[3]
>
> "(b)  give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

More particularly, she relies upon comment f to § 344, which states:

> "Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection."

---

[3]We have heretofore noted our puzzlement by the use of the conjunctive "or" in *Uihlein v. Albertson's, Inc.,* 282 Or 631, 639 fn. 7, 580 P2d 1014 (1978). Here, as there, no reason exists to explore the matter.

This court "adopted" those rules as reflecting the law of this state in *Whelchel v. Strangways,* 275 Or 297, 304, 550 P2d 1228 (1976). *See Uihlein v. Albertson's, Inc.,* 282 Or 631, 639, 580 P2d 1014 (1978).

Plaintiff alleged that defendants were negligent as follows:

"By failing to give Plaintiff a warning adequate to enable her to avoid the harm; [and]

"By failing to provide a reasonably sufficient security force to afford a reasonable protection from the harm."

To prove defendants' alleged failures in those respects, plaintiff adduced evidence from which it could be found that there were complaints to the Eugene Police Department (EPD) of incidents of criminal activity in and around the VRC lot, that the police officers taking and investigating the complaints made reports thereof to the EPD, and that the existence and content of the reports was readily available to the defendants.

Plaintiff offered a six-page computer printout prepared by EPD. Five pages were abstracts of some 268 reports by police officers of incidents of complaints of criminal activity in the immediate vicinity of VRC that had occurred between July and December, 1976, listed by the date of each report. The other page grouped the abstracts by crime category.

The testimony of Officer Goldsmith, the computer section supervisor when the printout was made in October, 1977, served as foundation for introduction of the exhibit. He testified that whenever a report by a police officer was written in Lane County or the City of Eugene, certain parts of the information from the report were stored in the police department's computer. According to Goldsmith's testimony, the printout was an accurate reflection of the information stored in the computer, as taken from the officers' reports. Another Eugene police officer, who appeared as defendants' witness, testified that such printouts were regularly used by the Eugene police to analyze crime rates in specific areas for the purpose, *inter alia,* of allocating police personnel to prevent crime.

The printout was received in evidence over the objections noted in the initial paragraph of this opinion.

After denying defendants' motion for a directed verdict, the trial court submitted the cause to the jury, which returned a verdict in favor of plaintiff. Defendants appealed from the judgment entered on the verdict, assigning error, *inter alia,* the admission of the printout in evidence and denial of the motion for directed verdict.[4]

The Court of Appeals found no error and affirmed, *Brown v. J. C. Penney Co.,* 64 Or App 293, 667 P2d 1047 (1983). Answering defendants' contentions that the printout was hearsay and that it was a summary for which no proper foundation had been established, the Court of Appeals held that the printout was not excludable as hearsay because it was properly admitted under a statutory exception to the hearsay rule. The court's predicate for its holding was former ORS 43.370,[5] which provided:

> "Entries in public or other official records, including books, data processing devices and computers, made by a public officer of this state or the United States in the performance of his duty or by another person in the performance of a duty specially enjoined by the law of either, are primary evidence of the facts stated."

The court held the printout was properly "certified"[6] by Goldsmith and was therefore admissible under former ORS 43.370.

As to the argument that the printout should not have been received as a summary because it had not been shown that the reports were too voluminous to present at trial and the reports themselves were not produced in court for examination by defendants, the Court of Appeals held that the

---

[4] Defendants assigned other errors in the Court of Appeals. From the decision of that court against them on those assignments, the defendants did not petition this court for review. We do not consider those other assignments.

[5] *See* footnote 1.

[6] The use of the word "certified" springs from former ORS 43.470(2), which provided:

> "Whenever a transcript of a public writing stored in machine language in a data processing device or computer is certified to be used as evidence, it shall be stated by the certifying officer that it is a correct transcript of specified data contained within the data processing device or computer."

*See State v. Sherman,* 48 Or App 881, 884, 618 P2d 973, *rev den* 290 Or 211 (1980).

same statute, former ORS 43.370, governed because that statute made the printout "primary" evidence.

The text of defendants' objection in the trial court on the ground of relevancy discloses that defendants objected because the printout contained reference to reports of crimes occurring outside the VRC and parking lot, in other words, not on premises under defendants' control. The Court of Appeals rejected this claim of error because

"There is no contention that all of the entries contained in the printout were irrelevant. Although defendants pointed out to the court specific entries that were arguably irrelevant, there was no motion to excise those but only a request that the entire exhibit be excluded. A general objection to evidence as a whole, if overruled, is not reversible error if some part is admissible."

64 Or App at 297.

We allowed defendants' petition for review primarily to consider the argument that the printout was not admissible.

## II.

We shall address the three objections in the order set forth in the first paragraph of this opinion.

### HEARSAY

On appeal the defendants asserted, and the plaintiff seemed to have assumed, that the trial court received the printout as an exception to the hearsay rule under the business records exception in former ORS 41.690,[7] which provided:

___

[7] ORS 41.690 was repealed by Oregon Laws 1981, chapter 892, and has been replaced by OEC 803(6), which provides:

"The following are not excluded by ORS 40.455, even though the declarant is available as a witness:

"* * * * *

"(6) A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

*See* fn. 1.

> "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

Defendants concede that "the business records exception applies to the hearsay which is created when the public employee feeds the information from the police reports into the computer." They argue, however, that the exception does not apply to the earlier hearsay, *i.e.,* the statement made by a complainant of crime to the police officer who eventually relates that statement in his report.

■ Our consideration of this argument requires us to determine for what precise purpose the printout was offered. If the purpose was to prove the truth of the statements of the various complainants of criminal activity, defendants' position is well taken; however, that was not the purpose of plaintiff's adducing this evidence. Plaintiff argues that the evidence was not offered to prove that the incidents had occurred but to prove the great number of reports made to the police of criminal activity in the lot and its environs. Plaintiff's argument is that the printout discloses some 268 such complaints made to the police in the six-month period preceding the injury to plaintiff. The reports by the police officers who took the complaints or investigated them tended to show that the complaints had been made; the reports did not, and could not, show that criminal activity had actually occurred. The reporting police officer had first hand knowledge of the fact that a complaint had been made and first hand knowledge of the content of the complaint. Where the issue is whether a complaint of certain content was made, the person to whom it was made would be a proper witness to prove the fact. That was the issue here.

■ The police officers' various reports that complaints of criminal activity had been made would be hearsay as the out-of-court statements by the officers that the complaints had been made, but we agree with the defendants' concession

that the information fed into the computer from those reports by the police officers is admissible under the business records exception to the hearsay rule.

■ An argument made below by defendants, but not pressed in their petition for review, is that the record was not made "at or near the time" as required by former ORS 41.690 because the printout was not made until October, 1977. That argument misses the mark because the "record" is stored in the computer in a form that is not comprehensible to human beings by sight, sound, taste, smell or touch. The printout is not the record; the printout is the means of making the record available for perusal by human beings.

■ We conclude that for the purpose for which the printout was offered it was admissible under former ORS 41.690 and would be admissible under OEC 803(6).[8]

### SUMMARY

As we have already noted, defendants contend that the printout was only a summary of the reports by the police and that under former ORS 41.640(1)(e) the printout could not be admitted unless plaintiff first satisfied the requirements of that statute by showing that the reports themselves were too voluminous to present to the trier of fact and by producing the reports in court for inspection by defendants. We first note that the statutory text requires neither predicate. They seem to be taken from McCormick on Evidence, 2d ed, § 233, page 564, to which this court alluded in *Shepherd v. Hub Lumber Co.,* 273 Or 331, 349, 541 P2d 439 (1975).[9]

■ Defendants' argument that the printout was a summary fails to address the crucial question whether the original writing rule of former ORS 41.640 is applicable at all to this printout. For the purpose of proving that there was information readily available to defendants that would have apprised them of the large number of complaints of criminal activity in the parking lot or its immediate vicinity, plaintiff offered the printout. For that purpose, it was the content of that writing

---

[8] This holding makes it unnecessary for us to consider plaintiff's other argument that the printout was admissible under former ORS 43.370, as held by the Court of Appeals.

[9] *See,* however, OEC 1006 set forth in fn. 1, which may require such a foundation.

that plaintiff wanted to prove. In determining what security measures would be necessary to afford reasonable protection to the customers using the parking lot, would the defendants have been interested in anything but the very writing on which the EPD, producer of the writing, relied in allocating police personnel for the prevention of crime? Can anyone seriously argue that had any of the defendants gone to the EPD and asked for and received the printout, that person would then have demanded to see the reports themselves for the purpose of investigating to determine if the complaints made to the EPD of criminal activity were actually true, *i.e.,* that crimes had been committed? Would that defendant have investigated further to see if the alleged criminal or the state would have prevailed on prosecution?

It was not the content of the reports that plaintiff sought to prove but, rather, the contents of the printout. The printout was the original writing within the meaning of former ORS 41.640 for the purpose at hand. We hold there was no error in this respect.

## RELEVANCY

As we have noted above, in the trial court the defendants contended in objecting to this evidence that it was irrelevant because it appeared from the printout that many of the incidents complained of did not occur in the lot itself or, from examination of the printout, it could not be determined that a given incident occurred in the lot. In this court, defendants complain of the Court of Appeals' reason for dismissing this claim of error on the ground that without the original reports by the police, defendants did not know which ones they should have moved to excise from the printout. The argument is somewhat disingenuous, for upon statement of the objection in the trial court, defendants' counsel drew particular attention to some incidents that had not occurred in the lot, but defendants did not even move to excise those from the exhibit.

██ From what we have already said, it is apparent that some of the complaints of criminal activity concerned incidents which allegedly occurred in the lot. If an exhibit contains no relevant matter, an objection on the ground of want of relevancy is sufficient to preserve the error for assertion on

appeal. Where the exhibit contains both relevant and irrelevant matter, however, and the objection is to the entire exhibit on the asserted ground of want of relevancy, the objection is insufficient to preserve a claim of error. This court so stated as early as *American Oil etc. Co. v. Foust,* 128 Or 263, 274 P 322 (1929), where the offered writings contained both relevant and irrelevant matter and were received over a general objection. This court said:

> "Defendant's letters contained hearsay statements and other matter which was irrelevant and immaterial. But the plaintiff's objections were offered, not to the inadmissible portions, but to the entire letter, and consisted of the general objection. It is well established that a general objection to testimony as a whole, does not avail when part of it is admissible: Wigmore on Ev. (2 ed.), § 18; Jones, Ev., Civil Cases (3 ed.), § 894. We have examined the letters carefully: each contained material which was admissible. Plaintiff's general objection was, therefore, properly overruled."

128 Or at 268. One who objects to an exhibit on the ground that it is not to be received because it contains irrelevant material must object to those specific parts, and an objection to the entire exhibit, if it contains relevant matter, will "avail nothing on appeal." *Gallagher v. Portland Traction Co.,* 181 Or 385, 392, 182 P2d 354 (1947). *See also Meislahn v. Demorest,* 48 Or App 631, 634-635, 617 P2d 322, *rev den,* 290 Or 249 (1980), on which the Court of Appeals relied, 64 Or App at 297, in the case at bar.

## DIRECTED VERDICT

■■ We last come to the issue of whether the trial court erred in denying defendant's motion for a directed verdict. Because plaintiff had verdict, we cannot set it aside unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action. Or Const Art VII (Amend), § 3. We do not weigh the evidence; we consider the evidence, including inferences, in the light most favorable to plaintiff. *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 562 P2d 545 (1977); *Myers v. Cessna Aircraft,* 275 Or 501, 553 P2d 355 (1976). The jury weighed the evidence, judged the credibility of the witnesses and resolved all conflicts in the evidence; therefore, we are entitled to state as fact that which there was

evidence to support. *Shepler v. Weyerhaeuser Company,* 279 Or 477, 569 P2d 1040 (1977).

Defendants do not really quarrel with those propositions. Their point is that there was no evidence to show that they knew, or in the exercise of reasonable care should have known, that a customer was likely to be the victim of crime in the parking lot. Our review of the record discloses evidence to meet that test.

Defendant Shields testified that he had set up a security force the day the mall opened. He hired defendant Ellsworth to head up the force because of the latter's extensive police experience. The prime responsibility of the security force was to "look after" the mall and parking lot, not the area within the various retail stores. There were six to eight people employed for that purpose. The defendants recognized that the more people there were to be expected in the lot, the more people should be involved in security there; therefore, sometimes there was one security man and sometimes two. Over the years the security force, as a whole, was increased to twelve to fourteen in December, 1976, of whom three to five or six would be on duty at any one time depending on the amount of traffic to be expected at the mall and lot. Defendant Shields was aware that near Christmas time there were more customers at the mall and in the lot and that more security personnel were required than at less busy times of the year. When the mall and lot were opened for business, defendant Shields made it clear to Ellsworth that Shields wanted a "clean operation" free of the presence of undesirable elements who might molest customers; therefore, he instructed Ellsworth and the security force that he wouldn't stand for harassment of customers as was happening in other shopping areas in the city. He never caused any signs or other warnings to be placed in the parking lot that there might be a risk of assault. Over the years from opening until this incident, the criminal incidents that happened in the area for which his security force was responsible were of a "minor nature."

Witness Hastings testified that he was security manager for Lloyd Center in Portland, another mall with parking lots and "common" areas under the patrol of his security forces. The security force there was to provide security for the mall owner and the customers. Over the years he had hired

extra people for security from Thanksgiving to the end of the year because of the influx of shoppers at that time and the influx of undesirables that accompanies the influx of shoppers. The number of uniformed, armed, security officers on patrol has a definite effect on deterring crime.

Witness Edwards was the chief of security at Washington Square in Portland, another similar mall and parking lot. He testified substantially to the same things with respect to that operation as had Hastings with respect to Lloyd Center. Putting on extra security people at Christmas shopping time had been shown statistically to have a preventive effect on crimes such as purse snatching, robbery, rape and kidnapping at Washington Square. He opined that it was important for the head of security to keep abreast of the incidence of criminal activity that is occurring "in the area" of the shopping center. He would use such statistical information to set the strength of his own forces and deploy them and to coordinate his efforts with local law enforcement agencies. He believed that installation of a video surveillance system over the parking lot would deter crime. The method of deploying available forces is very important.

Defendant Ellsworth testified that he was operations manager, including being in ultimate charge of security. In December, 1976, he had three uniformed security persons on duty at the time plaintiff was injured. One was assigned to the east side of the center, one to the west side, and one inside. The two outside men were in vehicles on the lot. During December, 1976, he did not hire additional security personnel but did redeploy his crew to take care of additional need for security and patrol as he recognized the need therefor. He was unable to state how many shoppers frequent the area on a daily average. "We haven't done any traffic counts of people in the mall as such." He did not think that they did as much business as Washington Square, although on some days they might have as many shoppers. Visibility of security men in uniform is a deterrent to crime. Sometimes when one of the officers in the lot took a break, the other would necessarily patrol the whole lot. Between 1969 and the time of plaintiff's injury, Ellsworth could recall that there had been eight to ten major crimes at the center.

While Ellsworth was chief of police in Eugene they kept statistics compiled from reports by police officers to determine high crime areas and times. He utilized the statistics developed from officers' reports of criminal incidents to provide "better protection" for the people of Eugene, and he believed that he had the same responsibility toward the customers at VRC. He believed that the EPD records currently kept were computerized and that he could have had access to them on request. He had not made an effort, however, to obtain from EPD statistical data concerning the frequency and incidence of crime at the VRC. His own security forces made reports of incidents of which they were aware at the VRC, but after a month the reports were stored away, although he had used them to compile data for the purpose of assigning his officers.

Ellsworth testified that he and his people were not even aware of the incident involving plaintiff until sometime later when they found out from the EPD that it had happened.

Ellsworth believed the frequency of crime to be the same in June as in December, in fact, that any two months would be the same.

Witness Michaud was an EPD detective. He had been employed as a security officer at VRC from February to August, 1976. During that period there were four incidents of "serious felony-type crime." They occurred in the buildings rather than the parking lot. His experience as a police officer demonstrated that criminal activity peaked during the Thanksgiving, Christmas time. He was aware that there was a "fairly high incidence" of crime in the parking lot of the hit and run and larceny varieties.

An exhibit (# 9) was introduced. It was a collection of some of the daily reports made by VRC security officers in 1976. The majority of them concerned crimes that had been reported or investigated by the security personnel in the area immediately adjacent to the VRC rather than in the parking lot.

Another exhibit (# 10) was introduced. This was a group of EPD police officers' reports ranging from July to December, 1976. They concerned incidents complained of at VRC or in the immediate vicinity.

A witness called by defendants, Ellingson, was a patrol sergeant for EPD, employed by that department for 19 years. The kind of statistics shown by the computer printout are utilized to define areas needing allocation of police personnel to deter crime.

There was, of course, also the computer printout showing that over 200 complaints had been made in the immediate vicinity of or at VRC of criminal incidents in the six months, July to December, 1976.

Defendants contend this court's decision in *Uihlein v. Albertson's, Inc.*, 282 Or 631, 580 P2d 1014 (1978), governs and requires reversal. Plaintiff contends that *Uihlein* is distinguishable.

In that case, the storekeepers' customer was injured in the store by a purse snatcher, much as in the case at bar. There, aside from her own injurious incident, the plaintiff produced no evidence of any crimes against customers in the store. Although her evidence was that the store was located in a "high crime rate area," there were no specifics. There was no evidence of the kind adduced in this case of the actual numbers of crimes reported as having occurred and the places, near or far, from the store's interior. The managers of the store felt "uneasy" and "spooky," and one felt it was the roughest store in which he had ever worked. As we pointed out in the opinion in that case, there was nothing to show that the manager felt uneasy because of fear of safety of customers. There was no evidence to show what conditions had existed in other stores, to which the present manager was making his comparison, that this one was the roughest. The defendant's evidence was uncontradicted that no patron had ever been injured in the store.

In *Uihlein* there was evidence that other supermarkets in the general area had some security forces, but there was no evidence to compare conditions in or near those stores with defendant's store. There was no evidence that the injury occurred in this supermarket at a time when more than usual patrons might be present.

In *Uihlein* the initial question was whether there was anything to put a reasonable storekeeper on notice that a security force, other than clerks and a manager, was needed.

We held there was not. The initial question here, where the defendants were aware of the need for security forces, is what would a reasonably prudent person in defendants' circumstances do to protect customers if he knew, or in the exercise of reasonable care should have known, that there were a large number of reports of complaints of crimes in the immediate area.

Defendants' position seems to be that they should have been put on notice of the likelihood of this injury to a customer only if all of the reported crimes in the area had actually occurred. As noted above, the EPD and other shopping center security directors acted on reports of criminal incidents and frequency in allocating forces to deter crime in their areas of responsibility.

We hold, as did the trial court and the Court of Appeals, that there was evidence from which the jury could have found these defendants were negligent in the particulars charged here under the rules of law set forth in 2 Restatement (Second) of Torts, § 344.

Affirmed.