Argued and submitted November 9, 1995, reversed and remanded with instructions May 15, petition for review denied July 16, 1996 (323 Or 690)

James Joseph HICKEY,
*Respondent,*

*v.*

Merthal SETTLEMIER,
*Appellant.*

(90-1082; CA A85719)

917 P2d 44

Thomas M. Christ argued the cause for appellant. With him on the briefs was Mitchell, Lang & Smith.

Andrew P. Ositis argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant Merthal Settlemier appeals from a judgment for plaintiff, James Hickey, following a jury trial in a "public figure" defamation action. We conclude that plaintiff failed to prove that defendant's statements were false. Accordingly, we reverse.

Plaintiff sold animals, under a license from the United States Agriculture Department, to hospitals and laboratories for use in medical research. He acquired the business in 1988 from his father, James Hickey, Sr., who owned and operated it until the USDA suspended his license. The business was the subject of USDA investigation,[1] nuisance actions, zoning variance opposition, and protest by animal welfare activists who charged that the kennel mistreated animals and bought and sold stolen pets. The controversy moved from local media to national television in 1990 when the ABC television news program "20/20" broadcast a segment entitled "Pet Bandits." The program pertained, in part, to plaintiff's business and included an interview with defendant, plaintiff's neighbor.

In that interview, conducted by reporter Stone Phillips, defendant made the statements that are the subject of this defamation action:

"[Reporter]: * * * Meet Joseph Hickey [plaintiff]. His animal supply operation in Lebanon, Oregon, started by his father, is believed to be the biggest on the West Coast. Hickey is what's known as a 'Class B' or 'random source' dealer. He doesn't raise animals for research, he buys them from pounds, animal shelters and private owners. He'll pay $20 for cats, $50 for dogs, then sell them to research facilities for five to ten times that much.

---

[1] In November 1988, after plaintiff's acquisition of the business, the USDA filed a formal complaint alleging that plaintiff had violated the Animal Welfare Act. 7 USC §§ 2131-57 (1988); 9 CFR §§ 1.1-12.10 (1991). In January 1990, an administrative law judge issued an order imposing a civil penalty of $10,000 and suspending plaintiff's license for one year. Plaintiff appealed that decision to the Judicial Officer of the Department of Agriculture who, in 1991, substantially adopted the opinion of the administrative law judge. By 1991, plaintiff was no longer in business. In an unpublished decision, the Ninth Circuit Court of Appeals affirmed the decision of the Department of Agriculture. *Hickey v. Dept. of Agriculture*, 991 F2d 803 (9th Cir 1993).

"* * *[M]ore than 300 people in central Oregon have complained that their pets were stolen and delivered to the Hickeys' operation. Many want it closed down, including Joseph Hickey's own godmother, Merthal Settlemier, who lives next door.

"[Defendant]: And it was very disturbing to think that things were going on over there that I saw that would happen in this day and age to animals. Even though they're being used for research, *it still is, to me, very inhuman.*

"[Reporter]: How would you describe the conditions over there for the animals?

"[Defendant]: *Well, the time I was over there, was three or four animals in a cage where there should be two. There was feces on the floor. Very warm day, no shade, no water. The food bowls were empty and the dogs were fighting each other.*

"[Reporter]: Have you heard gunshots?

"[Defendant]: *Yes, I have. Sometimes, it's once a week. Sometimes, it's maybe two times a week. Just this month, there was three gunshots early in the morning about nine o'clock. And we saw pools of blood where dogs could have died and .22 shells.*" (Emphasis supplied.)

Plaintiff filed suit,[2] alleging that defendant's statements were false and defamatory. After the trial court's entry of summary judgment for defendant was reversed on appeal,[3] the case went to trial in July 1994. At the close of plaintiff's evidence, defendant moved for a directed verdict and renewed that motion at the close of all evidence. The court denied those motions but, immediately preceding closing

---

[2] Plaintiff also filed suit against ABC. In *Hickey v. Capital Cities / ABC, Inc.*, 792 F Supp 1195 (D Or 1992), *aff'd* 999 F2d 543 (9th Cir 1993), the court granted summary judgment for ABC, holding that the allegedly defamatory statements at issue in that case—*i.e.*, statements by ABC correspondents—were substantially true or embodied opinion protected by the First Amendment. Those statements differed from those that are the subject of this action.

[3] The trial court allowed summary judgment for defendant on the ground that a decision by a federal administrative law judge, *see* note 1 above, established the truth of the allegedly defamatory statements as a matter of law. The Oregon Supreme Court ultimately reversed that holding. *Hickey v. Settlemier*, 318 Or 196, 201-02, 864 P2d 372 (1993). In addition, the court ruled that a portion of the "20/20" videotape was inadmissible, as it contained hearsay by a television correspondent. *Id.* That portion was excised and not considered by the jury, and we do not consider it here.

arguments, ruled that plaintiff was a public figure and that plaintiff was, therefore, required to prove "actual malice" by clear and convincing evidence. Defendant asked that the jury be instructed that plaintiff was required to prove actual malice—*i.e.*, that plaintiff must prove by clear and convincing evidence that defendant knew that her statements were false or had reckless disregard for their falsity.[4] However, the court failed to instruct the jury on actual malice. Thereafter, the jury rendered a verdict for plaintiff, awarding compensatory damages of $100,000.

Defendant moved for judgment *n.o.v.* and alternatively for a new trial, arguing, *inter alia*, that the trial court erred in failing to give defendant's requested jury instruction on actual malice. The trial court explained that it had intended to give the instruction and that its failure to do so was inadvertent, not intentional. Nevertheless, the court denied the motions and entered judgment for plaintiff.

On appeal, defendant raises two assignments of error: (1) The court erred in denying her motion for a directed verdict because plaintiff failed to prove either falsity or actual malice, both of which were essential elements of his "public figure" defamation claim.[5] (2) The court erred in failing to give defendant's requested instruction on actual malice.

---

[4] Plaintiff does not dispute that defendant's proposed instruction correctly stated the law. That instruction read:

"A published statement about a public figure or on a matter of public concern is privileged, even if false and defamatory, unless the publication was made with knowledge of the falsity of the communication [or] in reckless disregard for its truth or falsity. Reckless disregard means that the communication was made with a high degree of awareness of its probable falsity.

"Plaintiff has the burden of proving by clear and convincing evidence such knowledge of falsity or reckless disregard for the truth.

"In the absence of such proof, plaintiff cannot prevail."

The trial court's only reference to the concept of "actual malice" in the instructions was in its summary of plaintiff's amended complaint:

"It then alleges that the defendant made the statements knowing them to be false or with reckless disregard as to the truth or falsity."

After summarizing defendant's answer, the trial court admonished the jury that "you're not to take anything in that I've said in the pleadings as true unless it's either been admitted or proved by the evidence. The pleadings themselves are not evidence."

[5] Plaintiff does not contest the court's determination that, because of the public controversy surrounding the kennel's operations and its FDA tie-in, he was a "public figure" for purposes of this defamation action.

Defendant moved for directed verdict as follows:

"I would first say that as to those things which refer to the reference to feces, three or four animals in a cage, no shade, no water, food bowls empty and dogs were fighting, that there's been ample evidence of, that all of those matters are true, they are in fact true.

"As to the statements about inhuman conditions, when we look at that particular word and the specific words that are used, it says, 'it is still to me very inhuman,' that clearly expresses that she was giving her opinion about what she had seen based upon these other facts and based upon her observations when she in fact was over there. We combine that with the fact that her observations were in fact true, and what we have is nothing that's actionable based upon those statements.

"The other thing that I would move on the, for a directed verdict on is the, if the Court has heard enough evidence on this issue for the public figure, a matter that Mr. Hickey is a public figure and that assuming that there will be an amendment to the complaint to properly allege, which I have no objection to, an amendment to allege all of the necessary elements of actual malice, there has been no proof of actual malice in this case[.]"[6]

■ In reviewing the denial of that motion, we must first address the appropriate standard of review. In general, denials of directed verdict motions are tested against the "any evidence" standard summarized in *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984):

"Because plaintiff had verdict, we cannot set it aside unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action. Or Const Art VII (Amend), § 3. We do not weigh the evidence; we consider the evidence, including inferences, in the light most favorable to plaintiff."[7]

---

[6] Defendant also moved for directed verdict based on the argument that plaintiff presented no evidence showing that the allegedly defamatory statements were "of and concerning" plaintiff and not his father, the previous operator of the kennel. That argument is not raised on appeal.

[7] Article VII (Amended), section 3, of the Oregon Constitution provides, in part:

Plaintiff contends that that "any evidence" standard governs our assessment of the sufficiency of his proof of both falsity and actual malice. Defendant does not dispute that the "any evidence" standard may be applied to the jury's determination that her statements were false,[8] but asserts that we must test plaintiff's proof of actual malice against a more rigorous *de novo* standard of review:

> "[I]n a public figure defamation case, the appellate court 'must "make an independent examination of the whole record" * * * so as to assure [itself] the judgment does not constitute a forbidden intrusion on the field of free expression.' [*New York Times Co. v. Sullivan*, 376 US 254, 285, 84 S Ct 710, 11 L Ed 2d 686 (1964)], quoting *Edwards v. South Carolina*, 372 US 229, 235, 83 S Ct 680, 9 L Ed 697 (1963). Later, in *Rosenbloom v. Metromedia*, 403 US 29, 54, 91 S Ct 1811, 29 L Ed 2d 296 (1971), the Court reaffirmed its commitment to heightened appellate review in this type of case: 'The simple fact is that First Amendment questions of "constitutional fact" compel this court's de novo review.' "

We do not reach defendant's argument regarding the appropriate standard of judicial review of a jury's determination of actual malice because we conclude that plaintiff's proof of falsity was legally insufficient.

Defendant's allegedly false statements were, again, as follows:

> "And it was very disturbing to think that things were going on over there that I saw that would happen in this

---

"[N]o fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

[8] There is some conflict in federal case law as to whether falsity in public figure defamation cases must be proved by clear and convincing evidence and whether, as a matter of constitutional imperative, a reviewing court must test the sufficiency of a plaintiff's proof of falsity against a "clear and convincing" standard. *See, e.g., Bressler v. Fortune Magazine*, 971 F2d 1226 (6th Cir 1992), *cert den* 507 US 973 (1993) (Batchelder, J., dissenting); *Buckley v. Littell*, 539 F2d 882, 889-90 (2d Cir 1976), *cert den* 429 US 1062 (1977); *Firestone v. Time, Inc.*, 460 F2d 712, 722-23 (5th Cir), *cert den* 409 US 875 (1972) (Bell, J., specially concurring); *Goldwater v. Ginzburg*, 414 F2d 324, 341 (2d Cir 1969), *cert den* 396 US 1049 (1970); *Robertson v. McCloskey*, 666 F Supp 241, 248-50 (DDC 1987). The U.S. Supreme Court has declined to address that conflict. *Harte-Hanks, Inc. v. Connaughton*, 491 US 657, 661 n 2, 109 S Ct 2678, 105 L Ed 2d 562 (1989); *see generally* Rodney A. Smolla, *Law of Defamation*, § 5.06, 5-8.1; § 12.09, 12-41 to 12-52 (1986 and 1995 *supp*).

day and age to animals. Even though they're being used for research, it still is, to me, very inhuman."

"Well, the time I was over there, was three or four animals in a cage where there should be two. There was feces on the floor. Very warm day, no shade, no water. The food bowls were empty and the dogs were fighting each other."

"Sometimes [I hear gunshots] once a week. Sometimes, it's maybe two times a week. Just this month, there was three gunshots early in the morning about nine o'clock. And we saw pools of blood where dogs could have died and .22 shells."

Defendant challenges the sufficiency of plaintiff's proof on two grounds: (1) Her first statement that "it still is, to me, very inhuman" was merely an expression of opinion and not a statement of fact and, thus, was not actionable as demonstrably true or false. (2) Although the latter two statements were statements of fact, there was no evidence that they were false.

■ We agree with defendant that her first statement was a nonactionable expression of opinion. Opinions, as "statements that cannot reasonably be interpreted as stating actual facts," are constitutionally protected. *Milkovich v. Lorain Journal Co.*, 497 US 1, 20, 110 S Ct 2695, 111 L Ed 2d 1 (1990) (citation omitted); *see also Haas v. Painter*, 62 Or App 719, 725, 662 P2d 768, *rev den* 295 Or 297 (1983). Nevertheless, when an "opinion" implies the existence of undisclosed defamatory facts, it is actionable. *See Cushman v. Day*, 43 Or App 123, 126, 602 P2d 327 (1979), *rev den* 288 Or 571 (1980); *accord Restatement (Second) of Torts* § 566 (1965).[9]

■ Defendant counters, however, that the "undisclosed facts" exception is inapplicable here because her opinion was "based upon her observations when she was in fact over there," and that those alleged eyewitness observations—*e.g.*, overcrowded cages, empty food bowls, empty water bowls, etc.—were fully disclosed. We agree with defendant that

---

[9] *Restatement (Second) of Torts* § 566 provides:

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

there are no undisclosed facts implied in her description of conditions as "inhuman." Consequently, we conclude that that description was nonactionable opinion.

■      We proceed to the alleged falsity of the factual predicates of defendant's opinion—that is, the second and third statements set out above. Where, as here, plaintiff is a public figure,[10] the First Amendment imposes on plaintiff the burden of proving that the statements were false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 US 767, 775, 106 S Ct 1558, 89 L Ed 2d 783 (1986). The axiom that "truth is an absolute defense" in defamation cases, *Bahr v. Statesman Journal*, 51 Or App 177, 180, 624 P2d 664, *rev den* 291 Or 118 (1981), is somewhat imprecise in cases involving public figures or issues of public concern. Rather, in such cases, falsity is an element of plaintiff's defamation case, because plaintiff has the burden of proving it. *Philadelphia Newspapers*, 475 US at 776; *see also* Smolla, *Law of Defamation*, § 5.13[3], 5-31 to 5-32.

Under the "any evidence" standard of review, we consider whether we may "affirmatively say that there is no evidence from which the jury could have found" that defendant's statements were false. *Brown*, 297 Or at 705. In so doing, we examine the whole record, including evidence introduced by the defendant, in the light most favorable to plaintiff. *Id*.

■      Applying that standard, we conclude that plaintiff did not present any evidence from which the jury could have found defendant's statements to be false. It is uncontroverted that defendant did, in fact, visit the kennels once, in 1986, when they were operated by plaintiff's father. It is also uncontroverted that the conditions plaintiff described did, in fact, exist at certain times under both plaintiff's and his father's ownership—*i.e.*, that there were "three or four animals in a cage where there should be two"; "feces on the floor"; "no shade, no water" on a "very warm day"; "food bowls empty"; and "dogs fighting each other." For example, plaintiff's father testified that "sometimes" the food bowls were empty; that

[10] Again, plaintiff does not dispute on appeal that he was a "public figure." *See* n 8 above.

"sometimes" the dogs fought; that he had "at times" as many as 142 dogs in 44 cages, which is more than three per cage; and that he cleaned the cages at most twice per day, which would logically support an observation that there were times when feces were on the floor.

Notwithstanding that undisputed evidence, plaintiff contends that there is evidence that "casts significant doubt that the defendant actually saw what she claimed to have seen." Thus, plaintiff's claim in that regard reduces to the proposition that, although the conditions defendant described existed at various times, they did not exist on the day in 1986 that she visited the kennels.

There is no evidence substantiating plaintiff's position. Plaintiff presented no evidence that the conditions defendant described did not exist on the day she visited the kennels. Indeed, although plaintiff's father specifically recollected defendant's visit, he did not dispute the accuracy of her eyewitness account of conditions existing on that day. Instead, plaintiff relied on testimony that those conditions did not *always* exist as permitting an inference that they did not exist on the day in question. Moreover, plaintiff presented testimony that, he argued, demonstrated that defendant had a motive to fabricate her observations.[11] Plaintiff argues that, from that evidence, the jury could infer that the conditions described were not present on the particular day of defendant's visit.

Plaintiff's proof was legally insufficient. Given defendant's testimony that the conditions she described did, in fact, exist on the day she visited the kennels in 1986 and plaintiff's acknowledgment that the conditions described did sometimes exist, it was incumbent on plaintiff, as the party bearing the constitutional burden of proving falsity, to present evidence that the conditions described did not exist, or could not have existed, at the time of defendant's visit. Plaintiff's generalized evidence that the conditions defendant described existed only occasionally, even rarely, did not meet

---

[11] Plaintiff's evidence in that respect pertained to prior conflicts over the kennels and to defendant's alleged association with animal rights activists.

that burden. Instead, such undifferentiated, non-time-specific evidence merely permitted the jury to speculate as to whether certain conditions existed at any particular time. *See Skeeters v. Skeeters*, 237 Or 204, 214-15, 389 P2d 313 (1964) ("[T]he jury cannot be permitted to speculate, [but] can be allowed to draw reasonable inferences. * * * [P]laintiff has the burden to remove the cause from the realm of speculation and give it a basis in the proffered facts."); *accord Law v. Kemp*, 276 Or 581, 586, 556 P2d 109 (1976); *Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 171, 897 P2d 328 (1995).

■     Similarly, plaintiff's evidence pertaining to defendant's purported motive to fabricate was insufficient, by itself, to demonstrate falsity. The possibility that a jury might disbelieve a material witness cannot, without other direct or circumstantial evidence, justify denying a directed verdict motion. As we said in *Sivers v. R & F Capital Corp.*, 123 Or App 35, 41, 858 P2d 895 (1993), *rev den* 318 Or 351 (1994):

> "Although a jury may disbelieve a witness based on demeanor, bias, motives, interest or inconsistent statements, there must be evidence, direct or circumstantial, from which the jury can reasonably [make its finding]."

*Accord In re Taylor*, 319 Or 595, 607-08, 878 P2d 1103 (1994) ("Even if we were to entirely disbelieve the accused's testimony, that disbelief would not be evidence to establish any contrary proposition."); *State v. Simson*, 308 Or 102, 109, 775 P2d 837 (1989) ("Mere disbelief of a witness's positive assertion of fact would not constitute evidence to support the finding of a contrary fact.").

■     Plaintiff's proof of the falsity of defendant's third statement, pertaining to gunshots, pools of blood, and .22 shells, is similarly insufficient. Plaintiff acknowledged using a .22 to shoot animals at least two or three times a month, sometimes more regularly, and did not contest the fact that defendant could have heard shots the month of the television interview. Other witnesses testified that, on occasion, a dog would get loose and would be shot where it was found.

Notwithstanding those admissions and corroborating evidence, plaintiff argues that defendant's statements

gave rise to a false implication that plaintiff "unnecessarily" shot animals and that plaintiff's admissions "do not establish, as a matter of law, the truth or substantial truth" of that defamatory implication. As support for that proposition, plaintiff relies on our opinion in the prior appeal in this litigation, *Hickey v. Settlemier*, 116 Or App 436, 441, 841 P2d 675 (1992), *aff'd on other grounds* 318 Or 196, 864 P2d 372 (1993) (*Hickey I*).

Plaintiff's reliance on *Hickey I* is misplaced because our comments there pertained to a materially different record. In *Hickey I*, the record that we considered included the following exchange between the "20/20" correspondent and defendant:

"[Correspondent]: *And when the animals aren't suitable for research, Lethal Settlemier [sic] says they're shot.* Have you heard gunshots?

"[Defendant]: Yes, I have. Sometimes, it's once a week. Sometimes, it's maybe two times a week. Just this month, there was three gunshots early in the morning about nine o'clock. And we saw pools of blood where dogs could have died and .22 shells." (Emphasis supplied.)

On review of our decision in *Hickey I*, the Oregon Supreme Court held that the emphasized comments were inadmissible hearsay. 318 Or at 206. Thus, on remand, those comments, which were necessary predicates of our "unnecessary shooting" implication analysis in *Hickey I*, 116 Or App at 441, were not before the jury. With the correspondent's hearsay so deleted, nothing in defendant's statements could be reasonably construed to imply that plaintiff *unnecessarily* shot animals.

In conclusion, we may "affirmatively say that there is no evidence from which the jury could have found" defendant's second and third statements to be false. *Brown*, 297 Or at 705. Accordingly, the trial court erred in denying defendant's motion for a directed verdict because of the insufficiency of plaintiff's proof of falsity.[12]

---

[12] Because of our disposition, we do not address defendant's alternative arguments that: (1) plaintiff's proof of actual malice was legally insufficient; and (2) the trial court erred in failing to give defendant's requested instruction on actual malice.

Reversed and remanded with instructions to enter judgment for defendant.