Argued and submitted July 9, 1998, affirmed January 6, 1999

# Arthur L. TARLOW,
## *Respondent,*
### *v.*

# Andrew M. KELLY
# and Arthur D. Carlson,
## *Appellants.*

# (95C852672; CA A95147)

970 P2d 688

Gregory J. Englund argued the cause for appellant Andrew M. Kelly. With him on the briefs was Hooper, Englund & Weil LLP.

Wade V. Regier argued the cause for appellant Arthur D. Carlson. On the opening brief were Gary M. Bullock and Bullock & Regier, P.C.

Michael A. Cox argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

In this action, plaintiff seeks to recover $10,000 earnest money that he deposited in escrow as part of an agreement to purchase an apartment building from defendant Carlson. Defendants argue that Carlson is entitled to $5,000 of the earnest money and that defendant Kelly, Carlson's broker, is entitled to the other $5,000. The jury found for plaintiff, and defendants appeal. We affirm.

We state the facts most favorably to plaintiff because of the verdict in his favor. In 1994, Carlson owned the Aspen Highlands Apartments, while plaintiff owned the Six Quarters Apartments. Carlson wanted to sell Aspen and to purchase a larger apartment complex. After some negotiations, plaintiff agreed to purchase Aspen, provided that he could find a buyer for Six Quarters. In January 1995, Carlson and plaintiff entered into an earnest money agreement for the sale of Aspen. The agreement included a provision that time was of the essence.

It was essential for both plaintiff and Carlson that the transactions qualify as tax free exchanges under 26 USC § 1031, which meant that they had to occur simultaneously. Carlson, however, had difficulty finding a suitable replacement property. The parties extended the closing date and continued working on the transaction after the extended date passed. In the process, they agreed on a number of changes to the transaction. On June 14, 1995, they substituted a new earnest money agreement for the January agreement in order to reflect those changes.[1] Under the June agreement, the deal was to close on July 25, 1995, but no later than August 15, 1995. The June agreement, like the January agreement, had a time of the essence clause. In accordance with the agreements, plaintiff deposited $10,000 earnest money with the escrow agent. The agreement allowed Carlson to retain the earnest money as liquidated damages if plaintiff breached the agreement. Carlson and Kelly agreed

---

[1] When they entered into the June 14 agreement, plaintiff and Carlson did not abandon the original deal. Rather, they decided to execute a clean agreement instead of attaching extensive addenda to the original one.

that, in that event, Kelly would receive $5,000 of the earnest money.

Carlson ultimately agreed to purchase the Carrington complex as the second part of his section 1031 exchange; by that time plaintiff also had a buyer for Six Quarters. On August 11, Kelly called Smiley, a paralegal in plaintiff's law office who had a real estate broker's license and who acted as plaintiff's agent in the transaction, to find out if the Six Quarters sale would close by August 15. Smiley replied that it was unlikely to do so, because the purchaser's lender would be on vacation that week. Kelly replied that he would also be on vacation and would call Smiley when he returned; he did not suggest that going beyond the contract closing date of August 15 would cause any problem.[2] On August 22, Kelly called Smiley to say that he had learned at a golf tournament that the purchaser of Six Quarters would not qualify for a loan and thus would be unable to complete that purchase. Smiley responded that he had a back-up offer that he would activate. In the next days, Smiley pursued other offers, including ones that Kelly and his associate presented. Plaintiff ultimately chose the offer that Kelly believed would be the quickest to close.

On August 24, Kelly called Bennett, Carlson's attorney, to tell him the status of the transaction. Kelly asked Bennett to inform plaintiff that the deal would be off if it did not close the next day, August 25. Bennett then spoke with Smiley and conveyed that message. The next day, he sent plaintiff a letter by facsimile in which he stated that the parties had been "out of contract" since August 15 and that Carlson could, therefore, sell the property to another party. He indicated, however, that Carlson was still willing to sell to plaintiff but emphasized that no action of Carlson or his agents would constitute a waiver of Carlson's rights or bind him in any way unless they were set forth in a separate writing that Carlson signed. Bennett's letter was the first indication that either party believed that the agreement had terminated on August 15. Plaintiff, defendant, and their

---

[2] Indeed, as early as late June, Kelly, in a conversation with Carlson's attorney, indicated that, although the contract called for a closing by August 15, the transaction would probably actually close on August 20.

agents nevertheless continued to work toward closing the transaction.

On August 29, Smiley sent Kelly a copy of the offer on Six Quarters and, in response to Kelly's request, copies of the preliminary closing statements. That evening, at Kelly's request, Smiley gave him the telephone number of plaintiff's banker so that Kelly could confirm that the purchaser of Six Quarters had the ability to close the purchase. Before Kelly's last call to Smiley, and unknown to Smiley and plaintiff, Carlson had agreed to sell Aspen to a third party. That sale closed on August 31.

■ The parties' contentions about who is entitled to the earnest money are simple: according to plaintiff, Carlson breached the contract by selling to a third party and plaintiff, therefore, is entitled to the money; according to Carlson, plaintiff breached the contract by not closing on August 15, and Carlson and Kelly are entitled to it. Those contentions turn on whether, as Carlson argues, the August 15 closing date was effective or whether, as plaintiff asserts, Carlson, either directly or through Kelly as his agent, waived the time of the essence provision. The court presented the waiver issue to the jury as the sole factual question for it to resolve. The jury found in plaintiff's favor. We cannot reject that verdict unless there is no evidence to support it. *Brown v. J. C. Penny Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

■ The underlying difficulty with Carlson's assignments of error[3] is that they do not come to grips with the issues in the case as tried. In his first assignment, he argues that the trial court erred in denying his motion for a directed verdict. He argues, first, that the August 11 conversation between Kelly and Smiley did not constitute a waiver of the time of the essence clause beyond August 25 and, second, that any new agreement extending the time for performance after that date was void under the statute of frauds because it

---

[3] Kelly joins in Carlson's assignments of error but makes additional arguments on the waiver issue. At trial, he did not join in Carlson's objections to the admission of the documents that are involved in Carlson's second and third assignments and, in fact, expressly stated that he had no objection to one of them. Because we conclude that none of Carlson's assignments is well taken, we do not need to decide the effect on Kelly's appeal of those actions at trial.

was not in writing. The problem with those arguments is that they do not recognize the basis of plaintiff's claim or what the court submitted to the jury.

The trial court instructed the jury that the essential issue that it had to decide was whether defendants had waived the time of the essence clause in the June agreement:

"Now, we get to the issues of waiver and reinstatement. You must determine whether defendant Carlson waived the time limit provision of the agreement, whether the time limit provision was reinstated, and whether the plaintiff breached the agreement prior to August 29, 1995, the date defendant Carlson sold the Aspen Highlands to Root Holdings.

"What is a waiver? A waiver occurs when a party clearly shows his intent to abandon a known right. In a real estate sales contract that contains a time of the essence clause, voluntary tolerance by the seller of late performance by the buyer would constitute a waiver of the time limit provision.

"Once a seller waives the time limit of a land sales contract, he must before he can declare a breach by the purchaser reinstate the provision by, No. 1, giv[ing] notice to the purchaser that he intends in the future to require prompt performance of the contract; and, No. 2, giv[ing] the purchaser a reasonable time within which to perform.

"If you find that defendant Carlson personally or through an authorized agent waived the time limit provision of the agreement and did not reinstate the provision, your verdict should be for plaintiff and against the defendants. And, of course, if you find that defendant Carlson waived the time limit but did reinstate it then your verdict would be for the defendants and against the plaintiff."

Neither Carlson nor Kelly excepted to those instructions. They are generally consistent with the law on the waiver and reinstatement of time of the essence provisions in land sale contracts. *See, e.g., Alderman v. Davidson,* 326 Or 508, 513-14, 954 P2d 779 (1998); *Alk v. Lanini,* 61 Or App 158, 161-62, 656 P2d 367 (1982), *rev den* 294 Or 613 (1983); *Walker v. Feiring,* 53 Or App 433, 437-38, 632 P2d 1270 (1981).[4]

---

[4] Because defendants did not except to the instruction, we do not need to consider whether the final paragraph is incomplete in failing to give the jury the option of finding that Carlson did not waive the time of the essence clause at all.

The issue on the motion for a directed verdict, thus, is whether there is evidence from which the jury could find that Carlson, or Kelly on his behalf, waived the time of the essence clause and did not adequately reinstate it. Because there is no issue of a new agreement, the statute of frauds does not apply. The facts that we have described are sufficient to support the jury's verdict. The jury could conclude from them that both parties proceeded after August 15 as though that date had no effect on the validity of their agreement and that Carlson thereby voluntarily tolerated plaintiff's late performance. Carlson's focus on only the August 11 conversation between Smiley and Kelly ignores what the jury could conclude to be the full context of the relationship between the parties. The jury could also conclude that Bennett's telephone call to Smiley on August 24 and letter to plaintiff on August 25 were insufficient to reinstate the clause, in part because Bennett did not give plaintiff a reasonable time to perform. The trial court did not err in denying the motion for directed verdict.

Carlson's second assignment of error concerns the admission of a May 17 letter from Kelly, as agent for Carlson, to plaintiff terminating the original earnest money agreement on the ground that Carlson was unable to find a replacement property to satisfy the requirements of section 1031. Carlson asserts that the letter is insufficient to prove Kelly's authority to enter into an extension of the June agreement. That is not the purpose for which plaintiff offered it. There was evidence that, after sending the letter, Kelly called back the next day to say that the deal was on again. The letter, thus, was relevant to showing a pattern of ignoring closing dates and notices terminating the transaction, which would be relevant to whether Carlson waived the August 15 closing date and whether Bennett's letter reinstated it.

In his third assignment of error, Carlson attacks the admission of a letter and note on a facsimile cover sheet, both dated August 18, from a sales associate in Kelly's office about a possible listing for resale of the Aspen complex. Plaintiff intended to resell the units in the complex as separate units after he completed the purchase. Carlson argues that, because by that date the June 14 agreement had lapsed, the exhibits could be relevant only to prove a new agreement, but

there was no evidence that the sales associate had written authority to act for Carlson, as ORS 41.580(1)(f) requires. The problems with Carlson's argument include that there was evidence from which the jury could conclude, as it did, that the June 14 agreement had not lapsed because Carlson had waived the time of the essence provision and that the documents relate to a different sale from the June 14 agreement. As plaintiff points out, the documents are relevant to show that the deal was not dead on August 15: "Defendant Carlson's agents certainly would not be attempting to secure the listing for resale of Aspen from [plaintiff] if the transaction had already expired." The court did not err on the grounds that Carlson asserts.

■ Carlson's last two assignments require little discussion. The trial court did not err in refusing to instruct the jury on the statute of frauds. Assuming that an instruction on such a legal issue may at times be appropriate, it was not relevant to the issues that the jury had to decide, which involved waiver and reinstatement of the time of the essence provision in the June 14 agreement, not an entirely new agreement or a formal extension agreement to which the statute might apply. Finally, Carlson's assignment concerning the court's award of attorney fees would be relevant only if we reversed the judgment, which we do not. For the same reason, we do not need to consider plaintiff's cross-assignment of error.

Affirmed.