Argued and submitted September 10, affirmed December 12, 2012

Jocelyn BROWNE,
*Plaintiff-Respondent,*
*v.*

PORTLAND ADVENTIST MEDICAL CENTER,
an Oregon corporation,
*Defendant-Appellant,*
*and*

NORTHWEST CARDIOVASCULAR INSTITUTE, DLLP,
an Oregon domestic limited liability partnership,
*Defendant.*

Multnomah County Circuit Court
090709157; A148020

295 P3d 69

Jay W. Beattie argued the cause for appellant. With him on the briefs were Nikola L. Jones and Lindsay, Hart, Neil, & Weigler, LLP.

Timothy J. Vanagast argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Brewer, Judge, and Duncan, Judge.

BREWER, J.

**BREWER, J.**

In this medical negligence action, defendant Portland Adventist Medical Center appeals from a judgment awarding plaintiff damages on her claim that defendant failed to timely diagnose, and properly treat, a heart attack that she suffered on July 19, 2007.[1] Defendant assigns error to the trial court's denial of its motion for a directed verdict. We affirm.

We set out the evidence in the light most favorable to plaintiff, who prevailed at trial. *Rathgeber v. James Hemenway, Inc.*, 176 Or App 135, 137, 30 P3d 1200 (2001), *aff'd*, 335 Or 404, 69 P3d 710 (2003). On July 19, 2007, plaintiff went to the emergency room at the Portland Adventist Medical Center after experiencing severe chest pains and pain in her left and right arms, her neck, and her jaw. Plaintiff's symptoms had begun earlier that morning. Plaintiff had suffered a heart attack two days earlier and, on the same day, a stent had been implanted in her heart to clear an occluded artery. On July 19, plaintiff was treated at defendant's emergency department by Dr. Douglass, a physician who was employed by defendant. Douglass ordered a battery of tests including an (EKG) and a test to determine the possible presence of troponin, an enzyme that, when present in the blood, is an indicator that the patient has suffered a heart attack. The troponin test was administered around 11:30 a.m. on July 19 and produced a negative result. Douglass did not conduct a follow-up troponin test.

Between 11:30 a.m. and 12:20 p.m. on July 19, Douglass consulted with Dr. Hart, a cardiologist employed by Northwest Cardiovascular Institute, regarding plaintiff's condition. Hart was the "on call" cardiologist for defendant's emergency department on July 19. Douglass recounted plaintiff's medical history and her various test results to Hart. After reviewing the information provided by Douglass, Hart did not believe that plaintiff was suffering a heart attack. In particular, Hart opined that the results of plaintiff's EKG test did not suggest that she had suffered a

---

[1] A second defendant, Northwest Cardiovascular Institute, DLLP, has not appealed from the verdict and judgment in plaintiff's favor.

stent thrombosis, a condition where a blood clot builds up behind a stent. Instead, he recommended pain medication and tests for other possible conditions, including pulmonary embolism, gastric problems, and aortic dissection. Although Douglass had not asked Hart to personally examine plaintiff, Douglass assumed that Hart had done so; in fact, Hart had not examined plaintiff. At about 6:15 p.m. on July 19, Douglass discharged plaintiff from the emergency department, and she went home. At that point, Douglass had not identified the source of plaintiff's chest pain, but plaintiff had told him that the pain had receded.

The next day, plaintiff was examined by her cardiologist, Dr. Strelich, who administered a second troponin test. That test indicated that plaintiff had experienced a heart attack on July 19. Strelich concluded that the heart attack most likely was caused by stent thrombosis resulting from the development of a blood clot behind the stent that had been implanted in plaintiff's heart on July 17. Strelich recommended that plaintiff return to the hospital that day for treatment in a "cath lab."[2] Although plaintiff returned to Portland Adventist Medical Center the next day, she suffered permanently reduced cardiac output, as well as other ongoing symptoms, as a result of the heart attack that occurred on July 19.

Plaintiff filed this action, alleging, as pertinent here, that defendant had been negligent in (1) failing to diagnose the heart attack that she suffered on July 19; (2) failing to refer her to its cath lab for treatment; (3) failing to perform repeat EKG and troponin tests; and (4) failing to adequately communicate with Hart concerning plaintiff's treatment, including the determination of who would treat plaintiff.[3] Plaintiff alleged that, as a foreseeable result of those negligent acts, she was entitled to economic and noneconomic damages that flowed from her ensuing injuries.

The case was tried to a jury. After plaintiff rested, defendant moved for a directed verdict on all four specifications of negligence. Defendant conceded that there

---

[2] The term "cath lab" refers to a laboratory wherein cardiac catheterizations are performed. Catheterizations are used to remove blockages, such as blood clots, within the heart and its surrounding blood vessels.

[3] At trial, plaintiff withdrew a fifth specification of negligence.

was some evidence of negligence with respect to Douglass's decision not to perform a second troponin enzyme test and his failure to adequately communicate with Hart regarding plaintiff's condition and treatment. Defendant argued, however, that there was no evidence that Douglass's omissions had caused plaintiff's injuries because (1) the cardiologists with whom defendant consulted were the exclusive providers of cardiology treatment at its hospital; (2) those cardiologists, including Hart, testified that they would not have sent plaintiff to the cath lab for treatment on July 19; and (3) Douglass had no independent authority to send plaintiff to the cath lab or admit her to the hospital. From those premises, defendant asserted that Douglass's negligence, if any, in failing to conduct a second troponin test or failing to communicate with Hart was immaterial because Douglass had played no role in determining whether to send plaintiff to the cath lab.

The trial court granted defendant's motion for a directed verdict regarding the specification alleging that defendant had been negligent in failing to send plaintiff to the cath lab, but the court denied the motion with respect to the remaining three specifications of negligence. The jury returned a general verdict that did not distinguish among the three remaining specifications, finding that defendant had been negligent, that its negligence had caused plaintiff's injuries, and apportioning fault between defendant and Northwest Cardiovascular Institute. Defendant appeals from the ensuing judgment.

When reviewing the denial of a motion for directed verdict, we view the evidence, including any inferences, in the light most favorable to the nonmoving party. *Brown v. J.C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *DeNucci v. Henningsen*, 248 Or App 59, 65, 273 P3d 148 (2012). If, after viewing the facts in that light, the moving party is entitled to judgment as a matter of law, then a directed verdict is appropriate. *Wild Rose Ranch Enterprises v. Benton County*, 210 Or App 166, 168, 149 P3d 1281 (2006), *rev den*, 342 Or 504 (2007). However, the verdict cannot be set aside "unless we can affirmatively say that there is *no evidence* from which the jury could have found the facts necessary to establish the of plaintiff's cause of action." *Brown*, 297 Or at 705 (emphasis added).

Because the jury returned a general verdict based on multiple specifications of negligence, we must affirm the verdict if there is any evidence to support the submission of any of those specifications of negligence to the jury. *See, e.g.,* *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 176, 61 P3d 928 (2003) (under ORS 19.415(2), an appellate court may not reverse a general verdict based on multiple specifications if there is evidence to support at least one valid specification). As explained above, defendant conceded that there was evidence that it was negligent with respect to two of plaintiff's specifications of negligence. Accordingly, we consider whether there is evidence in the record showing that such negligence caused plaintiff's damage-producing injuries.

Because it is sufficient to do so, we focus only on plaintiff's second specification that defendant's negligent failure to conduct a second troponin enzyme test caused plaintiff's injuries. One of plaintiff's expert witnesses, Dr. Nelson, testified that the longer the delay before a heart patient receives interventional treatment, the more heart tissue is likely to be lost. Nelson opined that, if Douglass had conducted a second troponin enzyme test six hours after plaintiff began experiencing heart pain, that test would have shown that she was experiencing a heart attack. According to Nelson, the applicable standard of care for an emergency room physician required Douglass to conduct such a repeat test, because it would mitigate the extent of any permanent injury to plaintiff's heart. That evidence was sufficient for the jury to find that Douglass's failure to conduct a second troponin test resulted in a delay in diagnosing plaintiff's heart attack that caused her injuries and related damages.

Defendant remonstrates that Hart testified that, even if "Douglass had correctly diagnosed plaintiff's condition as a heart attack, he would not have performed coronary angioplasty," a treatment, defendant asserts, that "[plaintiff] claimed was the only potentially curative treatment." For two reasons, that argument is not persuasive. First, plaintiff's evidence did not show that coronary angioplasty was the only potentially curative treatment for her condition. In particular, Nelson testified that, in addition to coronary angioplasty, plaintiff's occluded stent could have been treated with "lytic drugs" or a "coronary artery bypass graft."

Second, the jury was not required to accept as true Hart's testimony that, regardless of the results of a repeat troponin test, Hart would not have sent plaintiff to the cath lab for treatment. Defendant correctly notes that the possibility that a jury might disbelieve a material witness cannot, without other direct or circumstantial evidence, justify denying a directed verdict motion." *Hickey v. Settlemier*, 141 Or App 103, 113, 917 P2d 44, *rev den*, 323 Or 690 (1996). Here, however, Hart testified that, generally speaking, if a heart attack were diagnosed within 12 hours of the onset of symptoms, he would aggressively treat the patient's condition. Based on that evidence, the jury reasonably could have found that, if Douglass had actually diagnosed plaintiff's heart attack by timely conducting a second troponin test six hours after the onset of plaintiff's symptoms, Hart would have sent plaintiff to the cath lab for additional treatment regardless of his professed disavowal at trial of that course of treatment.

In sum, there was evidence in the record from which the jury could have found that Douglass's failure to conduct a second troponin enzyme test caused plaintiff to suffer greater injury to her heart than would have occurred if he had conducted that test. It follows that the trial court properly denied defendant's motion for a directed verdict.

Affirmed.