Argued and submitted November 6, 2006, reversed and remanded for new trial as to breach of contract claim; affirmed as to *quantum meruit* claim; reversed as to supplemental judgments for attorney fees May 16, 2007

## CYBERCO HOLDINGS, INC.,
dba CyberNET Engineering, Inc.,
a Michigan corporation,
by and through Thomas C. Richardson,
the Trustee for the bankruptcy estate of
Cyberco Holdings, Inc.,
dba CyberNET Engineering, Inc.,
*Plaintiff-Respondent,*

*v.*

## CON-WAY TRANSPORATION SERVICES, INC.,
a CNF Company,
a Delaware corporation,
*Defendant-Appellant.*

Multnomah County Circuit Court
010707220; A122067

159 P3d 359

Bruce L. Campbell argued the cause for appellant. With him on the opening brief were Peter C. Richter and Miller Nash LLP. With him on the reply brief was Michelle E. Barton.

John L. Langslet argued the cause for respondent. With him on the brief were Douglas G. Pickett and Martin, Bischoff, Templeton, Langslet & Hoffman, LLP.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe,* Judges.

EDMONDS, P. J.

---

* Sercombe, J., *vice* Linder, J.

## EDMONDS, P. J.

This case arises out of an agreement between plaintiff Cyberco Holdings, Inc., dba CyberNET Engineering, Inc. ("CyberNET")[1] and defendant Con-Way Transportation Services, Inc. ("Con-Way") under which CyberNET was to modernize Con-Way's computer network. CyberNET brought claims for breach of contract and *quantum meruit*, and Con-Way asserted various counterclaims. Ultimately, a jury returned a verdict for CyberNET, awarding it $411,267 on its breach of contract claim and $194,400 on its *quantum meruit* claim.[2] The trial court then entered judgment in favor of CyberNET and awarded it attorney fees. Con-Way appeals, arguing that the breach of contract claim must be remanded for a new trial, that judgment on the *quantum meruit* claim should be reversed, and that the contract between the parties does not authorize an attorney fee award. We affirm the judgment as to the *quantum meruit* claim, remand for a new trial on the breach of contract claim, and reverse the award of attorney fees.

## I. BACKGROUND

In October 1999, Con-Way, which operates a nationwide freight-trucking system, sought bids to upgrade its computer network and facilities at its service centers throughout the country. CyberNET submitted a bid in response, and, in January 2000, Con-Way and CyberNET entered into a distributed systems installation agreement ("the Agreement"). Under the Agreement, CyberNET agreed, among other things, to install computer systems equipment, including local area network ("LAN") infrastructure and thin client devices ("TCDs").[3] More specifically, the Agreement called for the installation of approximately 4,000 TCDs at more than 360 sites.

---

[1] While this case was on appeal, the trustee for the bankruptcy estate of Cyberco Holdings, Inc., was substituted as a party to the case.

[2] CyberNET's *quantum meruit* claim is based on services different from those on which the breach of contract claim is based.

[3] A TCD takes the place of a personal computer. Rather than operating from its own hard drive and programs, it accesses a central server or series of servers at a remote location. The technology is designed to reduce the costs associated with repairing or updating personal computers at remote locations.

The project, known as the "Ascend project," was to be implemented in three phases and required a coordinated effort from Con-Way, CyberNET, and Con-Way's other contractors, AT&T and Equant Corporation. During the first phase of the Ascend project, Con-Way was to test certain technology and products. During the second phase, CyberNET was to install the LAN wiring infrastructure, basic equipment racks, and an uninterrupted power supply device. AT&T was to install cable for the Internet connection, and Equant was to install the router that would coordinate transmission of data over the Internet. During the third phase, CyberNET was to install the TCDs and train Con-Way's employees to use them.

The Ascend project was to be implemented in a rolling progression from the East Coast to the West Coast. For reasons of economy, project sites were grouped geographically, and the schedule for the project was based on those groupings. Ultimately, as a result of problems beyond CyberNET's control, the schedule collapsed, and the sites were not available to CyberNET to work at as expected. Consequently, CyberNET installers were required to move around the country, depending on which circuits were available, and to expend considerable time doubling back and revisiting the same sites on multiple occasions. In addition, problems with the cable installed by AT&T and technical problems with Equant's router caused CyberNET crews to perform additional labor once they were at the sites. Finally, because of difficulty in scheduling installations with Con-Way's site managers, CyberNET crews were required to work at night and in multiple shifts.

After scheduling problems surfaced, CyberNET's senior vice president, Jonathan Mast, met with Con-Way's project manager, Scott Vanderwaal, and Con-Way's primary scheduling representative, Andy Pella, to discuss the impact of the delays on CyberNET's costs and its ability to implement the project in a timely fashion. Vanderwaal asked Mast to keep the schedule and to work on alternative sites as they were completed. The parties further discussed the fact that Con-Way's request would cause CyberNET to perform additional work to coordinate site installations that was not part of the original bid.

Following that meeting, CyberNET worked with Con-Way to reschedule site installations. Con-Way acknowledged that CyberNET's costs were increasing beyond what had initially been anticipated but insisted that Con-Way "absolutely had to maintain as close as possible integrity with the schedule[.]" Con-Way told CyberNET to "[j]ust roll up your sleeves and do it. Get the job done, and we'll make sure you're taken care of." Vanderwaal told Mast to continue to bill for the additional charges and to "bill them along the same basis that we had for the contract." During the course of the Ascend project, CyberNET periodically submitted change orders to Con-Way for additional costs that were incurred (1) in performing services under the Agreement or (2) in performing work that it believed was beyond the scope of the original agreement. The change orders, generated by CyberNET, provided that Con-Way's project manager "must accept or reject this Change Order within **THREE (3) days** of the date of this Change Order," and that Con-Way's failure to accept or reject within the period of time shall be deemed a rejection of the change order. (Boldface and uppercase in original.) Given the exigent circumstances, Mast and Vanderwaal agreed that verbal approvals would be accepted in lieu of written change orders to keep the project moving as quickly as possible. Over the course of the project, CyberNET submitted a series of change orders numbered 101 through 125.

The project was completed in December 2000. However, Con-Way and CyberNET continued to have ongoing disputes about unpaid invoices that CyberNET submitted to Con-Way, and Con-Way claimed that CyberNET had failed to return to Con-Way additional TCDs that were not installed during the project. In April 2001, Con-Way filed a complaint against CyberNET in Michigan state court in an effort to recover possession of approximately 1,400 TCDs that were being stored in CyberNET's warehouse in Grand Rapids, Michigan. CyberNET, in turn, filed an action in United States District Court in Oregon, asserting that Con-Way had breached the Agreement. It also filed an action in United States District Court in the Eastern District of Michigan.

In the Michigan state court action, Con-Way and CyberNET agreed to a settlement, which was memorialized

by the entry of a stipulated court order. In the order, CyberNET agreed to turn over possession of all TCDs, subject to a final audit performed jointly by the parties. Con-Way, in return, agreed to transfer by wire $300,000 to CyberNET. The $300,000 payment was to "be applied to the balance of Con-Way's account with CyberNET."

The stipulated order further established a mechanism for resolving the parties' disagreement regarding the disputed invoices. Paragraph 6 of the stipulated order provides:

"The parties shall meet to review and reconcile CyberNET's invoices to Con-Way ("invoice reconciliation process"). If the parties are able to reach agreement during the invoice reconciliation process, Con-Way shall pay any additional outstanding amount due on its account with CyberNET. If the parties agree during the invoice reconciliation process that Con-Way has paid CyberNET more than it owed on its account, then CyberNET shall refund the amount of overpayment to Con-Way. All such payments shall be made within 14 days of reaching agreement."

Paragraph 7 provides:

"The invoice reconciliation process shall include review and consideration of all amounts invoiced through March 29, 2001. The parties agree that their dispute regarding the invoice reconciliation process concerns only amounts that have been invoiced on or before March 29, 2001. Any services that CyberNET provided to Con-Way were provided before March 29, 2001 and have already been invoiced."

The stipulated order also addressed the parties' other pending lawsuits. CyberNET agreed to dismiss its action filed in the Eastern District of Michigan, and agreed to stay the action filed in Oregon "to give the parties an opportunity to resolve their dispute." Paragraph 15 of the stipulated order provides:

"CyberNET agrees that if it continues prosecution of the action that it filed in the United States District Court in the District of Oregon, as described above, CyberNET shall limit its claims to contract-based theories (including quasi-contract or implied contract theories) that seek only compensatory damages regarding disputed amounts pertaining to the invoice reconciliation process. CyberNET agrees that

it will not seek punitive or non-economic damages with regard to the Oregon lawsuit."

Ultimately, the parties' dispute was not resolved through the "invoice reconciliation process" set forth in the stipulated order, and CyberNET filed this action.[4] The case was tried to a jury, and the jury returned a verdict for CyberNET on its breach of contract and *quantum meruit* claims. This appeal followed.

## II.  ANALYSIS

### A.  *Breach of contract claim*

Con-Way's first four assignments of error pertain to the stipulated order, and whether there was a deadline or cutoff date for the presentation of invoices for work performed by CyberNET under the Agreement. CyberNET argues that those assignments of error are not properly before us, because they were not adequately preserved. ORAP 5.45. For that reason, we set out the context of the trial court's rulings in detail. Before trial, Con-Way filed a motion *in limine* to exclude evidence of invoices dated June 6, 2001, arguing that CyberNET was barred from recovering the amounts represented by those invoices as a result of the stipulated order and its reference to invoices presented before March 29, 2001. In response, CyberNET argued that, because the stipulated order constituted a settlement, evidence of the order was inadmissible under OEC 408.[5] The trial court agreed with CyberNET and ruled that "[i]t's a settlement agreement, and the agreement itself will not come in."

During the course of the trial, Con-Way asked the court to revisit its "preliminary ruling" regarding evidence of the stipulated order. Con-Way argued that it had made a $300,000 payment pursuant to the stipulated order and that

---

[4] CyberNET eventually dismissed the action in federal court in Oregon and instead filed its complaint in state court. In the trial court, the parties treated this case as the continuation of the prosecution of the Oregon litigation referenced in the stipulated order, and CyberNET has not contended otherwise on appeal.

[5] The text of OEC 408 is set forth in full at 212 Or App at 587.

it needed to be able to argue about what invoices that payment covered. CyberNET reiterated its position that admission of the stipulated order into evidence was barred by OEC 408, and it argued that "the settlement fell apart. It was never completed." After the parties were unable to agree whether evidence of the order should be admitted, the court ruled that it was "coming back to the same place I started from regarding the settlement agreements." The court later explained:

> "I don't think that I've ruled that the settlement order or settlement agreement comes in. But—and I haven't ruled that way. But what I have ruled is that certain aspects that made up the settlement order or agreement that are specific to the claims or defenses of the parties will come in, although they shouldn't be referred to, necessarily, as part of the settlement agreement or anything like that, because then the jurors are going to start writing notes, can we see that agreement. And so if it's just in a document that was signed on such-and-such a date, this was what Con-Way agreed to, this is what CyberNET agreed to, then we'll just have to go from there."

It is apparent from the record that the parties differed in their understandings of the court's ruling. Issues concerning the stipulated order surfaced again when Con-Way offered evidence of the terms of the stipulated order through one of its witnesses, Mark Ozbun. During that round of arguments, the court stated,

> "So I guess my ruling [regarding the stipulated order] * * * is not going to change in that regard. My reading of subsection 2 and all of 408 and the commentary, as much as I've been able to skim it, is that it's not intended to cover or be an umbrella over a completed agreement, one that has been executed. But there's a dispute as to whether one side or the other performed their obligations under [it]. But nevertheless, they talk about any evidence of conduct or statement that may compromise negotiations. And this I view as something that was agreed upon by the parties prior to engaging in a global settlement of the issues. And while it would have been a part and parcel of it if it had just been an agreement in and of itself, when the $300,000 check was written and accepted and deposited, then to the extent that Con-Way has an understanding of what that $300,000 was

to cover when they wrote that check, that can come into evidence."

Con-Way's counsel disagreed. He contended that, under paragraph 15 of the stipulated order, the invoice reconciliation process was actually "part and parcel of [the] settlement agreement." When the invoice reconciliation process fell through, "the only claims that are permitted are those claims which CyberNET—those invoices which CyberNET had submitted for work as of March 29 under that reconciliation process." The trial court rejected Con-Way's argument and permitted Ozbun to testify to his understanding of the $300,000 payment and as to any cutoff date. However, the court did not allow Ozbun to testify regarding the specifics of the settlement discussions between the parties.

As the trial progressed, the trial court was called upon to rule regarding a proposed jury instruction by Con-Way. That proposed instruction read, "The Michigan court order is presumed to settle the matters that were in dispute in the Michigan litigation, which is presumed to be binding in Oregon, limited [sic] plaintiff's claims in this action to those concerning invoices that were submitted by March 29, 2001." The court ruled that it was "leaving the jury instruction out but allowing [Con-Way] to argue that March 29 of 2001 was the cutoff for all invoices based on the agreement the parties had among themselves." Con-Way's counsel then asked the court whether he could argue to the jury that, "regardless of whether the reconciliation process falls apart or not, any lawsuits continuing thereafter will only be limited to those invoices submitted as of March 29th, as the stipulated order said." CyberNET's counsel objected, arguing that "the stipulated order is not in evidence. I mean * * * he can't argue the stipulated order." The court clarified its ruling:

> "The part of the stipulated order which I am allowing in is the fact that the parties agree at one point in time that, in an effort to resolve all of the issues long after the work had been done, that all invoices would be—were to be submitted for work done up to or for invoices produced up to March 29th, although there was a short carryover time period where they could get those invoices in. But still, March 29th was that—the cutoff date."

In response, Con-Way's counsel pointed out to the court that, because of the court's earlier rulings, there was in fact no testimony *in front of the jury* regarding the March 29 cutoff. Rather than recalling Ozbun as a witness, CyberNET's counsel agreed with Con-Way's counsel that he would not dispute that March 29 was the cutoff date for the submission of invoices to Con-Way for extra work that had been done:

"[CON-WAY'S COUNSEL]: Then you will not dispute that March 29 was the cutoff?

"[CYBERNET'S COUNSEL]: I will not dispute the existence of the March 29th date. That is true.

"[CON-WAY'S COUNSEL]: You will argue that you found some more invoices; you thought you're entitled to be paid for them?

"[CYBERNET'S COUNSEL]: That's correct.

"[CON-WAY'S COUNSEL]: I'm satisfied, your honor."

Initially, CyberNET argues that, as a result of Con-Way's counsel's statement to the court that he was "satisfied," Con-Way failed to preserve any of the errors asserted in its first four assignments. According to CyberNET, the trial court ultimately ruled "that Con-Way could argue to the jury that 'March 29, 2001 was the cut-off for all invoices based on the agreement the parties had among themselves[,' and] Con-Way's counsel stated on the record that he was 'satisfied with the court's ruling.' " Thus, according to CyberNET, Con-Way "waived" any claim of error regarding the trial court's prior rulings regarding the admissibility of the particulars of the stipulated order.

■ In reply, Con-Way argues that CyberNET mischaracterizes its counsel's statement. Based on our review of the record, we agree with Con-Way's understanding of the scope of its counsel's statement. Con-Way's counsel indicated that he was "satisfied" with the arrangement whereby he would not need to recall Ozbun as a witness to put on evidence but would instead argue that the March 29 date was the cutoff date for presenting invoices without contradiction from CyberNET's counsel. Nothing in the record indicates that Con-Way's counsel intended to forgo the objections that had

been made earlier. Indeed, the arrangement between counsel became necessary because of the trial court's previous rulings that had excluded most evidence concerning the stipulated order from the jury's consideration—rulings to which Con-Way had repeatedly objected. Moreover, by stating that he was "satisfied" with that arrangement, Con-Way's counsel did not invite the trial court to believe that he had withdrawn his objections to the court's previous rulings concerning the exclusion of evidence of the stipulated order or of testimony regarding the circumstances of the settlement. We therefore conclude that Con-Way preserved the issue framed by its first four assignments of error in the trial court, that it did not waive any of those issues before the trial court, and that they are properly before us.

We turn, then, to whether OEC 408 in fact bars the admission of evidence of the stipulated order, as the trial court ruled.[6] As explained above, Con-Way offered evidence of the stipulated order to prove that the parties agreed in the Michigan litigation to limit their dispute in Oregon to amounts that were invoiced on or before March 29, 2001. Paragraph 15 of the stipulated order provides, in part, that "CyberNET agrees that if it continues prosecution of the [Oregon action], CyberNET shall limit its claims to contract-based theories (including quasi-contract or implied contract theories) that seek only compensatory damages *regarding disputed amounts pertaining to the invoice reconciliation process*." (Emphasis added.) Paragraph 7 of the stipulated order appears to define the scope of the disputed amounts concerning the "invoice reconciliation process":

> "The invoice reconciliation process shall include review and consideration of all amounts invoiced through March 29, 2001. The parties agree that their dispute regarding the invoice reconciliation process concerns only amounts that have been invoiced on or before March 29, 2001. Any services that CyberNET provided to Con-Way were provided before March 29, 2001 and have already been invoiced."

Based on those provisions, Con-Way argues that the parties had agreed that, as part of the Oregon litigation, CyberNET

---

[6] The parties agree that the stipulated order memorializes, on the record, the settlement agreement of the parties.

would not seek damages based on amounts that were invoiced after March 29, 2001.

■        CyberNET responds that the trial court correctly ruled that the stipulated order was inadmissible under OEC 408. Con-Way acknowledges that OEC 408 prohibits a party from offering the stipulated order to prove "liability or invalidity of a claim." It argues, however, that OEC 408 does not prohibit "a trier of fact from considering the effect of a consummated settlement agreement." For the reasons that follow, we agree with Con-Way's argument.[7]

OEC 408 provides:

"(1)(a)    Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

"(b)    Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

"(2)(a)    Subsection (1) of this section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

"(b)    Subsection (1) of this section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

Whether OEC 408 bars the admission of the stipulated order is a question of statutory construction that requires us to discern the intent of the legislature. Therefore, we apply the familiar template for statutory construction by first examining the text and context of the rule. It is manifest from the text of the rule that it does not bar the admission of evidence of settlement offers, negotiations, or agreements for

---

[7] Our analysis specifically addresses Con-Way's first assignment of error. Because we reverse and remand for a new trial on that assignment, we need not reach the second, third, and fourth assignments, each of which may or may not arise on remand.

*all* purposes. Rather, it bars the admission of evidence of compromise or attempting to settle a claim if that evidence is offered *"to prove liability for or invalidity of the claim or its amount."* OEC 408(1)(a) (emphasis added). Moreover, the rule specifically provides that it does not require exclusion "when the evidence is offered for another purpose * * *." OEC 408(2)(b). Thus, the preliminary question is whether the evidence of the stipulated order was offered in this case to prove "liability for or invalidity of" CyberNET's breach of contract claim or "its amount," or whether the evidence instead was offered for "another purpose." That is, we must determine whether a party is permitted to offer evidence to establish that, after the events giving rise to the underlying claims in the action, the parties entered into a settlement that limited the scope or amount of those claims.

OEC 408 does not further define when evidence is offered to prove "liability for or invalidity of the claim or its amount." Nor do the examples of when evidence may be offered for "another purpose" under OEC 408(2)(b), "such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution[,]" aid in our analysis of the issue in this case. And, although we have on occasion discussed the permissible uses of evidence pertaining to settlement negotiations, *see Bidwell and Bidwell*, 173 Or App 288, 292-93, 21 P3d 161 (2001) (evidence of letters sent during settlement negotiations, offered to prove that a party did not pursue settlement in objectively reasonable manner for purposes of attorney fee claim, was not offered to "prove liability for or invalidity of" claims for purpose of OEC 408), our case law concerning OEC 408 is likewise unhelpful in answering the question before us.

Accordingly, we turn to the legislative history of OEC 408. The rule was enacted in 1981 and is based on Rule 408 of the Federal Rules of Evidence. Legislative Commentary to OEC 408, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 408.02, Art IV-119-20 (4th ed 2002).[8] The purpose of the

---

[8] Legislative commentary on the Oregon Evidence Code is considered as part of the code's legislative history. *State ex rel OHSU v. Haas*, 325 Or 492, 506 n 10, 942 P2d 261 (1997).

rule is to promote "the public policy favoring compromise and settlement of disputes." *Id.* Prior to the enactment of OEC 408, Oregon followed the common-law rule under which "an admission of fact made in the course of compromise negotiations is not protected unless it is hypothetical or is expressly stated to be 'without prejudice,' or is so inseparably connected with the offer that it cannot be correctly understood without reading the two together." *Id.* The "inevitable effect of that rule" was to "inhibit freedom of communication with respect to compromise, even among lawyers." *Id.* The common-law rule also generated controversy as to whether a negotiating statement was protected or not. Ultimately, the "Legislative Assembly was persuaded by these considerations in rejecting the common law rule." *Id.*

In light of the legislature's clear statement of policy to promote settlement, we conclude that OEC 408 does not prohibit a party from offering evidence that, subsequent to the events giving rise to the claims at issue, the parties entered into an agreement that limited the scope of the claims or extinguished certain damages. A construction of OEC 408 that would prohibit a party from offering such evidence would frustrate the legislature's intent to promote settlement; that is, if the goal of compromise and settlement of disputes is to be achieved, parties must be allowed to offer evidence of the legal effect of their agreements, even though the effect of those agreements is to reduce the "amount" of the underlying claim.[9] *Cf. Cates v. Morgan Portable Bldg. Corp.*, 780 F2d 683, 691 (7th Cir 1985) ("[The defendant's] liability

---

[9] The commentary to OEC 408 states that it includes completed compromises: "While the rule is ordinarily phrased in terms of offers of compromise, it is apparent that a similar attitude must be taken with respect to completed compromises when offered against a party thereto. *Zahumensky v. Fandrich*, 200 Or 588, 267 P2d 664 (1954)." Arguably, that portion of the commentary supports CyberNET's position. However, it is clear, based on the context of that statement and the citation to *Zahumensky*, that the commentary is referring to the use of completed compromises with *third parties*. In *Zahumensky*, the plaintiff, who was injured while riding in the defendant's automobile, sought to offer evidence that the defendant had settled with the driver of the other vehicle. The court held, "where a settlement is made by way of compromise with a third person not a party to the suit, arising out of the same transaction or incident, evidence of the settlement with that third person is not admissible in evidence as an admission of liability." *Zahumensky*, 200 Or at 591. The commentary does not address the situation in this case, where the evidence is offered to demonstrate a completed agreement between *the parties in the action.*

for additional damages beginning in September 1973 is based on its breaking a later promise, the promise made in the stipulation to resume repairs. Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement.").

Our reasoning is consistent with the view expressed in one of the leading commentaries on the federal analog to OEC 408:

"[I]f suit is brought for breach of the settlement contract, Rule 408 does not prevent the plaintiff from proving the agreement. By parity of reasoning, the same result should follow when the defense to the original claim is predicated on a compromise, e.g. when the defendant pleads the compromise as a release, accord and satisfaction, or novation. *Although it can be argued that this use of the compromise involves proof of the 'invalidity of the claim,' it does so not by using the compromise as circumstantial evidence of the opponent's belief in the invalidity of the claim but as proof of an act whose legal effect is to extinguish his right to recover.*"

Charles Alan Wright and Kenneth W. Graham, Jr., 23 *Federal Practice and Procedure* § 5314, 281 (1980 & Supp 2007) (emphasis added; footnotes omitted).

It follows that the trial court erred in excluding evidence of the stipulated order. Con-Way did not offer the stipulated order "to prove liability for or invalidity of the claim or its amount." Instead, Con-Way offered the stipulated order to prove that a subsequent agreement between the parties limited the scope of the amount in dispute—a permissible purpose under OEC 408. Accordingly, OEC 408 was not a valid ground for the trial court's exclusion of evidence of the stipulated order.[10]

---

[10] CyberNET contends that the trial court rejected Con-Way's proposed construction of the agreement. The court stated that the agreement could be "looked at two different ways. It can be looked at as [Con-Way] read it, or it can be looked at as if you can't agree on invoices that occurred before March 29, I guess you go to court." Con-Way's counsel then suggested that, if there is an ambiguity, the court should hear evidence of the parties' intent. After further discussion, however, the court concluded that it had come "back to the same place I started from regarding settlement agreements." To the extent that the parties dispute the meaning of the stipulated order, that dispute can be resolved on remand without resort to OEC 408.

Nonetheless, CyberNET advances a number of alternative grounds for affirming the judgment as to the breach of contract claim. First, CyberNET argues that the stipulated order was "mutually and voluntarily abandoned," based on the fact that the "reconciliation procedure broke down." CyberNET concedes, however, that it accepted a $300,000 payment as part of the stipulated order. Moreover, the stipulated order itself appears to contemplate the possibility that the process would be unsuccessful; in that event, CyberNET was permitted by the stipulation under paragraph 15 to litigate its claims in Oregon. We are unpersuaded, on this record, that there is sufficient evidence of waiver or abandonment of the rights under the stipulated order to affirm on that alternative basis.

■ Next, CyberNET argues that, because the trial court permitted the parties to argue to the jury that March 29, 2001, was the cutoff date for invoices, Con-Way cannot demonstrate that the trial court's error was reversible because the error did not substantially affect Con-Way's rights. ORS 19.415(2). We disagree. Con-Way's position at trial was that the March 29 date was a firm cutoff date agreed upon by the parties, after which no more invoices would be paid. CyberNET took the position that it could recover for all invoices, regardless of the date of the invoice. The trial court's evidentiary rulings prohibited Con-Way from offering the most persuasive evidence available to support its assertion— evidence of the written and stipulated order. The concept of a fair trial contemplates that each party is able to try its case to the hilt, within the boundaries of admissible evidence. *See, e.g.,* OEC 402 ("All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon, or by the Oregon statutory and decisional law."). Here, the terms of the stipulated order were at the core of Con-Way's position that the parties had agreed that amounts invoiced after March 29 would not be paid. Yet, Con-Way was denied the ability to offer documentary evidence to prove that fact, evidence that was qualitatively more persuasive and different from the limited argument allowed by the court. Because of the court's rulings, even though Con-Way was permitted to argue orally to the jury regarding the cutoff date, the error substantially

affected the rights of Con-Way. Accordingly, we must remand for a new trial on the breach of contract claim.[11]

In its fifth assignment of error, Con-Way argues that the trial court erred in admitting into evidence unsigned change orders. The questions presented by this assignment— including whether Con-Way preserved certain issues and whether CyberNET expressly abandoned certain theories— most likely will arise in a different posture on remand. For that reason, we decline to address the fifth assignment of error in light of our determination that the breach of contract claim must be remanded for a new trial.

### B. *Quantum meruit claim*

■ Con-Way's sixth assignment of error concerns CyberNET's *quantum meruit* claim. Con-Way argues that the trial court erred in denying its motion for a directed verdict on that claim, because CyberNET failed to offer any evidence that its charges were reasonable. For the reasons that follow, we affirm the trial court's denial of the motion.

■ "Upon review of a denial of a motion for a directed verdict, we will not set aside a jury verdict 'unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of [the] plaintiff's cause of action.'" *Conway v. Pacific University*, 324 Or 231, 235, 924 P2d 818 (1996) (quoting *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984)) (brackets in *Conway*). The question before us is whether CyberNET presented any evidence from which the jury could have found the facts necessary to establish each element of a *quantum meruit* claim.

■ To establish a *quantum meruit* claim based on the reasonable value of labor and/or materials provided, CyberNET was required to prove (1) that the labor and/or materials were supplied for the benefit of Con-Way; (2) that what was supplied was necessary and reasonable; and (3) that the charges for what was supplied were reasonable.

---

[11] CyberNET also states, without further elaboration, that "Con-Way cannot show that admission of any particular invoices affected the outcome." CyberNET, however, offered evidence that at least $85,084.47 of the jury's award was attributable to June 2001 invoices, and CyberNET does not argue to the contrary.

*Sisters of St. Joseph of Russell*, 122 Or App 188, 191-92, 857 P2d 192 (1993), *rev'd on other grounds*, 318 Or 370, 867 P2d 1377 (1994); *Haggard v. Edwards*, 57 Or App 537, 539, 645 P2d 590, *rev den*, 293 Or 483 (1982). Con-Way argues that plaintiff did not present any evidence of the third element, *i.e.*, that the charges were reasonable.

Con-Way's arguments focus on the inadequacy of four items of proof: (1) Change Order 117; (2) Change Order 118; (3) Invoice 77720; and (4) Invoice 77722. We begin—and end—with the arguments regarding Change Order 117. That change order identified charges in the amount of "$324,000 for additional person days expended due to additional travel and schedule deviations * * *." At trial, the individual who prepared Change Order 117, Dr. Blossom, testified that the "person days" were calculated in relation to the number of people who were required to work on the Ascend project under the "original schedule." Blossom explained that, in response to Con-Way's request for proposals, CyberNET had anticipated that 10 cablers and installers and 5 trainers would be required to complete the project in 13 weeks. Based on those numbers, he calculated that CyberNET would have invested 1,625 "person days" in the project, which represented the number of actual days that people at CyberNET would have worked on the project.

Next, Blossom calculated the number of days actually spent on the project, and the average number of cablers, installers, and trainers. Multiplying that number by the number of weeks actually spent on the project (43) and by the number of days worked each week (5), Blossom calculated that CyberNET had spent 2,365 person days on the project. After subtracting certain change orders that were invoiced separately, Blossom concluded that CyberNET had spent an additional 648 person days on the project beyond those originally anticipated.

Blossom testified that he charged Con-Way $500 for each additional "person day," which included all employee expenses, such as insurance, social security, and taxes. According to Blossom, that amount was "about half of what was in the original proposal," which was about $1,000 per day. CyberNET used the lower rate, according to Blossom,

because it "had a good relationship with them" and there was "more work coming down the line[.]"

CyberNET argues that it met its burden to demonstrate the reasonableness of the charges in Change Order 117 because it presented evidence that the rate charged for the additional labor was below the rate agreed to by the parties. *See Cloud v. Riddell*, 54 Or App 917, 922, 636 P2d 996 (1981), *rev den*, 292 Or 581 (1982) ("[E]vidence that the labor here was performed at less than the agreed rate is evidence of the reasonableness of the labor charges."). Con-Way disputes that characterization of the evidence. According to Con-Way,

> "there was no agreed rate for labor charges. To the contrary, the Agreement sets a fixed price of $467 for each 'node' or TCD that CyberNET installs (or $450 per node if CyberNET installs more than 4,208 nodes). The parties did not agree on a labor rate, a materials rate, or any other rate apart from the price per node. CyberNET's labor charges are based solely on its internal allocation of costs, which is not competent evidence of the reasonableness of its charges."

Con-Way is correct that the parties did not expressly agree on a "person day" or labor rate. That, however, is not fatal to CyberNET's argument. The question is whether CyberNET presented any evidence from which a rational trier of fact could infer that CyberNET's charges for its work were less than charged under the agreed rate. Here, CyberNET presented evidence that, if believed, would permit the trier of fact to conclude that the contract rate—though couched in terms of a fixed price "per node"—included the cost of labor at a "person day" rate of $1,000.

The contract rate, as Con-Way points out, was stated as a "per node" rate of $467. That rate is the same rate that appears in CyberNET's proposal, which was incorporated into the contract. Blossom, in turn, testified that the "charge per person day in the original proposal" was "about $1,000 per day." Based on that evidence, the jury could have inferred that the contract rate (stated in terms of the price per node) was calculated based on a labor rate of approximately $1,000 per person day. The jury further could have concluded, based on that evidence, that the "person day" rate of $500 charged

by CyberNET was less than the agreed rate and therefore was a reasonable rate for the labor performed. Although Con-Way is correct that those calculations are based, in part, on CyberNET's internal allocation of costs, the jury was entitled to believe Blossom's testimony that the original proposal (and node rate) represented a $1,000 "person day" rate for labor and to draw inferences from that testimony about the reasonableness of the additional charges. *See State v. Miller*, 196 Or App 354, 358, 103 P3d 112 (2004), *rev den*, 338 Or 488 (2005) ("The inference need not inevitably follow from the established facts; rather, if the established facts support multiple reasonable inferences, the jury may decide which inference to draw."); *see also Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 474, 928 P2d 980 (1996) (weaknesses in a plaintiff's evidence concerning damages may be explored by contrary evidence).

Because CyberNET presented some evidence from which the jury could have determined that the charges in Change Order 117 were reasonable, the trial court correctly denied Con-Way's motion for a directed verdict.[12]

C. *Attorney fees*

In its final assignment of error, Con-Way argues that the trial court erred in awarding attorney fees under the contract.[13] Because we are reversing and remanding the judgment with respect to the breach of contract claim, we necessarily reverse the award of attorney fees predicated on that judgment. ORS 20.220(3).

Reversed and remanded for new trial as to breach of contract claim; affirmed as to *quantum meruit* claim; reversed as to supplemental judgments for attorney fees.

---

[12] Change Order 117 requested payment of $324,000. The jury's total award on the *quantum meruit* claim was $194,400.

[13] The trial court's award of attorney fees was based solely on the breach of contract claim.