Argued and submitted October 7, 2005, affirmed August 2, petition for review denied December 19, 2006 (342 Or 253)

Dean BROWN,
*Appellant,*

*v.*

BOARD OF EDUCATION,
Clackamas Community College District,
and Larry Dexheimer,
*Respondents.*

CCV 0001462; A116833 (Control)

Michael SHIDLER,
*Appellant,*

*v.*

BOARD OF EDUCATION,
Clackamas Community College District,
and Larry Dexheimer,
*Respondents.*

CCV 0001463; A117175
(Cases Consolidated)

139 P3d 1048

Philip F. Schuster II argued the cause for appellants. With him on the briefs was Dierking & Schuster.

Lisa E. Lear argued the cause for respondents. With her on the briefs were Karen M. Vickers and Bullivant Houser Bailey PC.

Before Linder, Presiding Judge, and Brewer, Chief Judge,* and Leggert, Judge pro tempore.

BREWER C. J.

* Brewer, C. J., *vice* Wollheim, J.

**BREWER, C. J.**

Plaintiffs are former employees of defendant Clackamas Community College District (the college). After the college terminated their employment, they brought this action seeking damages for claims that included wrongful discharge. The trial court granted a directed verdict to defendants on all of plaintiffs' claims. Plaintiffs appeal from the directed verdict on their claims for wrongful discharge. We affirm.[1]

We state the facts most favorably to plaintiffs because of the directed verdict in defendants' favor. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). Plaintiffs were formerly employed as Public Safety Officers (PSOs) for the college. Plaintiff Brown began working part time in May 1998 and became a full-time employee in August. Plaintiff Shidler filled Brown's former part-time position in September. Under an agreement between the college and the Clackamas County Sheriff, each plaintiff also was a Special Deputy Sheriff, which entitled him to carry a gun and to make arrests while on duty. As part of that role, each plaintiff received a law enforcement officer registration number from the state Department of Public Safety Standards and Training (DPSST). It is not necessary to be a certified law enforcement officer in order to receive a registration number; neither plaintiff had the necessary training to be certified. As PSOs, plaintiffs' duties included patrolling the college properties, enforcing applicable laws and ordinances, acting on behalf of the sheriff under appropriate circumstances on college properties or in transit between those properties, conducting investigations and interviews, and writing reports. Defendant Larry Dexheimer[2] was the Chief of Public Safety at the college and plaintiffs' supervisor. There was significant tension between Dexheimer and most of the other PSOs, including plaintiffs.

In September 1998, the college hired Richard Dixson as a part-time PSO. Dexheimer, who became a personal

---

[1] Plaintiffs do not challenge the directed verdicts on their claims for libel, slander, and breach of contract.

[2] Dexheimer was a defendant only as to the slander and libel claims that are not involved in this appeal.

friend of Dixson, told plaintiffs that Dixson was a retired police officer with 20 years' experience; Dixson told plaintiffs that he had 30 years' experience as a police officer with the Veterans' Administration (VA) in White City. On his employment application, Dixson stated only that he had worked for the VA for two years. In fact, Dixson had been a patient at the VA hospital during that period and had worked as a patient guard; his duties were limited to checking doors, answering phones, and monitoring alarms.

Before working for the college, Dixson had received private security guard registration number 442 from the DPSST's predecessor. If that number had been a law enforcement registration number it would have indicated a person with about 30 years' experience. He received a new and much higher law enforcement officer registration number after he began working for the college. At times, he nevertheless used the private security number instead of the higher law enforcement registration number, possibly including for his Clackamas County Deputy Sheriff identification. When Shidler or Brown asked Dixson why he had two numbers, Dixson replied that someone else was using his first number so he had had to get a second. In October 1998, when Dixson and other PSOs were practicing with their pistols at a firing range, Dixson acted in a way that was both dangerous and inconsistent with his being an experienced officer.

The Driver and Motor Vehicles Division suspended Dixson's driver's license on December 14, 1998. The college learned of the suspension sometime afterwards. Because possessing a valid driver's license was one of the minimum criteria for holding a PSO position, the college fired Dixson effective December 29; the letter terminating him invited him to reapply after the suspension ended in February. Dexheimer did not tell the other PSOs of Dixson's termination until the morning of January 11, 1999; until then he said only that Dixson was out sick.

Early in the morning of January 1, 1999, after his termination, Dixson got into a dispute with another customer at a tavern in Molalla. He identified himself as a deputy sheriff, took the customer outside, and searched him for weapons, finding none. The customer became angry and ultimately the

bartender asked both disputants to leave. The bartender called the Molalla police, but Dixson had left by the time the officer arrived, and the bartender did not know his identity. Late in the evening of January 7, 1999, or early in the morning of January 8, Dixson again caused problems at the same tavern, after which he left for a different tavern. The bartender again called the police, and Molalla Police Officer Kramer found Dixson in the second tavern. Dixson told Kramer that he was a deputy sheriff and showed Kramer the identification he had received through his employment as a PSO.[3] Kramer then called the public safety office at the college and spoke with Shidler, who was on duty. Kramer told Shidler what he had learned about Dixson's actions and asked whether Dixson was a college PSO. After speaking with Kramer, Shidler called the PSO sergeant and then, at the sergeant's instructions, called Dexheimer. Dexheimer expressed disbelief about what Shidler told him. Neither the sergeant, Dexheimer, nor Kramer asked Shidler to take any further action, and there was no evidence that plaintiffs ever investigated Dixson's conduct at the Molalla tavern.

By this time, Shidler and Brown had become concerned that Dixson had misrepresented his qualifications when he was hired as a PSO. After learning of Dixson's actions at the Molalla tavern, they decided to investigate Dixson's background. Shidler called the DPSST and learned that law enforcement registration number 442 actually belonged to a retired officer from Pendleton whose name was not Dixson. He also called the VA in White City and learned that Dixson had been a patient, not an employee, and had had only a limited role as a patient guard. He asked the VA police chief to send a confirming letter to Brown at the Gladstone Police Department, where Brown had a part-time position as a property officer; the chief did so. Shidler did not ask the VA chief to write him at the college because he did not think that the college mail was sufficiently secure. Brown

---

[3] The court refused to admit evidence of most of the details of Dixson's actions at the taverns and his statements to Kramer, a refusal that is the subject of some of plaintiffs' assignments of error. We nevertheless include those details as context for plaintiffs' actions and because Dixson's actions are relevant to our evaluation of plaintiffs' claims. For the reasons that we describe below, we conclude that any error on the trial court's part was harmless.

also ran a criminal background check on Dixson and discovered an old conviction for theft. Shidler and Brown began the investigation before they learned of Dixson's termination; they continued it afterwards. They did not tell Dexheimer or the college's human relations department that they were conducting the investigation or what its results were.

Dixson ultimately discovered that he was being investigated and complained to Dexheimer, who learned that Brown and Shidler were responsible for the investigation. The college concluded that Brown and Shidler had abused their authority by conducting the investigation and therefore terminated their employments. In response, they filed these actions seeking, among other relief, damages for wrongful discharge. The trial court granted defendants' motion for a directed verdict after the close of plaintiffs' evidence. That action is the subject of plaintiffs' first assignment of error. We review a grant of a directed verdict for errors of law, viewing all of the evidence most favorably to plaintiffs. *Mauri*, 324 Or at 479.

■ Although the general rule is that an employer may terminate an employee at will, a discharge may nevertheless be wrongful under certain circumstances.[4] We therefore consider the merits of plaintiffs' claims.

■ The two circumstances that the Supreme Court has identified are, first, when the discharge is for exercising a job-related right that reflects an important public policy and, second, when the discharge is for fulfilling an important public duty. *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). To the extent that plaintiffs argue that they were exercising a job-related right when they investigated

---

[4] Plaintiffs argue that the action of a different judge in denying defendants' motions for summary judgment established the law of the case and thus prevented the trial judge from granting a directed verdict based on similar legal arguments. Plaintiffs are mistaken.

"[T]here is nothing in the law of the case idea that prohibits a trial judge from reconsidering a ruling that the judge made. Also, it does not prohibit one judge, in a multi-judge court, from reconsidering a ruling of a colleague. *State ex rel Harmon v. Blanding*, 292 Or 752, 644 P2d 1082 (1982); *Highway Comm. v. Superbilt Mfg. Co.*, 204 Or 393, 281 P2d 707 (1955)."

*State v. Demings*, 116 Or App 394, 396-97, 841 P2d 660 (1992), *rev den*, 315 Or 443 (1993).

Dixson, the trial court did not err in directing the verdict. A job-related right is a personal benefit or right to which the employee is entitled as a matter of public policy. The classic example is workers' compensation benefits. *See Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978). Investigating a coworker may be a job duty, but it is not a personal right or benefit.

■       The primary thrust of plaintiffs' argument is that their investigation of Dixson fulfilled an important public duty. We begin our consideration of that argument with the Supreme Court's decision in *Babick*, in which the plaintiffs also asserted that their law enforcement activities furthered an important public duty. The plaintiffs in *Babick* alleged that the defendant employed them as private security guards and that, in that capacity and in accordance with the training that the defendant gave them, some of the plaintiffs made a number of legal arrests of members of the audience at a rock concert for engaging in assaultive behavior and for illegal possession of alcohol and drugs. Thereafter, the plaintiffs asserted, the defendant fired them in retaliation for those lawful law enforcement actions. The plaintiffs sued for damages for wrongful discharge, but the trial court granted the defendant's motion to dismiss under ORCP 21 A(8). We reversed the trial court's decision with respect to the claims of the guards who actually made the arrests. *Babick v. Oregon Arena Corp.*, 160 Or App 140, 980 P2d 1147 (1999). The Supreme Court, however, reversed our decision in that respect and reinstated the trial court's judgment on the wrongful discharge claim.

In its decision, the Supreme Court first noted that we had correctly held that a court must find a public duty based on constitutional and statutory provisions; a court may not simply create such a duty. The court then evaluated the sources on which we had relied as establishing a public duty and found them unpersuasive. *Babick*, 333 Or at 407-10. In doing so, it was not required to decide whether, as the defendant argued, a public duty exists only if a statute or other source of law explicitly requires the employee to act in the way that led to the discharge. Rather, the Supreme Court concluded that the statutes on which this court had relied were simply general expressions of a public desire for law and

order; stated differently, those statutes did not create a public duty for private citizens to perform a specific act, the arrest of lawbreakers. *Id.* at 408-09. In the same way, statutes authorizing private citizens to make an arrest may have reflected a public concern about enforcement in the absence of police officers, but they did not show that such acts enjoyed a high social value. *Id.* at 409. Finally, the court held that statutes regulating the training and licensing of private security personnel did not suggest that their actions had higher social value than that of employees in other professions, nor did they impose an affirmative duty to arrest lawbreakers. *Id.* at 409-10.

Plaintiffs argue that there is a crucial distinction between *Babick* and this case. In *Babick*, the plaintiffs were private security guards who had no public duty to enforce the law. In this case, however, plaintiffs were deputy sheriffs, and they point to a number of statutes and rules that impose a duty on them to investigate criminal activity. Thus, they assert that they had a public duty that the plaintiffs in *Babick* did not. We do not need to decide whether plaintiffs' proposed distinction is correct. The problem with their argument is that the actions that led to their terminations were not related to investigating the criminal activity that they identify.

■ Plaintiffs assert that they were "investigating whether or not a fellow employee was committing the felony of impersonating a police officer." ORS 162.365(1) (1999) provided that "[a] person commits the crime of criminal impersonation if with intent to obtain a benefit or to injure or defraud another the person falsely impersonates a public servant and does an act in such assumed character." The offense is normally a Class A misdemeanor, but it is a Class C felony if the public servant impersonated is, among others, a police officer. ORS 162.365(3)(b). A person does not violate the statute simply by impersonating a public servant; it is essential that the person do some act in the assumed character. *In re Jeffrey Steffen*, 279 Or 313, 316, 567 P2d 544 (1977).

In this case, the only times when Dixson may have impersonated a police officer were on January 1 and 8, 1999, *after* his termination as a PSO. The only time that he acted in

the capacity of a police officer was on January 1, when he searched the customer for guns. Before those dates, Dixson was a Clackamas County Special Deputy Sheriff and thus could not have impersonated one by using his deputy sheriff's identification.[5] In light of those circumstances, the question is what purported crime of impersonation plaintiffs were investigating.

When they began their investigation, plaintiffs did not know that Dixson was no longer a PSO and, thus, that he was no longer a deputy sheriff.[6] What is most important, none of plaintiffs' investigation related to what Dixson did in January. Rather, plaintiffs were concerned that Dixson had lied about his previous experience in order to become a PSO and they therefore investigated possible misstatements that he may have made in the course of obtaining that employment. Everything that they did—checking with the Veterans' Administration, running a criminal background search on Dixson, checking on his DPSST numbers—was related to his qualifications to be hired as a PSO and to the adequacy of Dexheimer's background check. In their briefs on appeal, those are the concerns that plaintiffs emphasize, along with Dixson's unsafe actions at a firing range and other activities while he was a PSO. However, nothing that plaintiffs could have learned in those respects would have showed that Dixson had violated ORS 162.365. For example, falsely asserting that one has extensive experience as a police officer in order to obtain a position as a PSO is not performing an act as a police officer. Thus, assertions related to Dixson's qualifications for employment could not have constituted a crime under the only criminal statute that plaintiffs have identified as a basis for their investigation. Nor would Dixson's incompetent performance on the job show that he had committed that crime.

Although, as discussed, some of Dixson's conduct after he was terminated could have served as a basis for

[5] The record does not indicate whether Dixson's termination as a PSO automatically terminated his position as a deputy sheriff or whether it was necessary for the sheriff to take some additional action in that regard.

[6] Indeed, they assert on appeal that they were investigating a "fellow employee."

investigating whether he committed the asserted crime, plaintiffs point to nothing in the record showing that they actually investigated that conduct. It is true that, on January 8, Kramer asked Shidler whether Dixson was a deputy sheriff for the college and described what Dixson had done at the tavern. However, the conversation did not involve Shidler conducting an investigation. Rather, it was part of Kramer's investigation of Dixson's actions, with Shidler serving as a source of information. The record does not show that either plaintiff did anything to expand on Kramer's investigation of those incidents. In short, Kramer investigated the January incidents, told Shidler about them, and Shidler passed that information on to his superiors and to Brown. Beyond that, the only connection between Kramer's investigation and plaintiffs' terminations was that it became the stimulus for their own investigation of actions that preceded the January events—and that is the investigation that resulted in plaintiffs' terminations.

■      To summarize, viewed in the light most favorable to plaintiffs, the evidence shows that they had become increasingly uncertain about Dixson and that Kramer's call led them to take action—but the action was to investigate the things that had previously bothered them, not the things that Shidler learned from Kramer. Because plaintiffs' investigation of Dixson's actions that preceded the January events did not involve the crime of impersonating a police officer, there was no evidence that, in performing that investigation, plaintiffs were performing an important public duty. Accordingly, the trial court did not err in granting a directed verdict based on the evidence before it.[7]

Plaintiffs also assert that the trial court erred in a number of evidentiary rulings. For the reasons explained

---

[7] In certain circumstances, a wrongful discharge claim may lie when an employer retaliates for an employee's good faith invocation of a statutory right, whether or not that right actually exists. *See, e.g., McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 684 P2d 21, *rev den*, 298 Or 37 (1984) (concluding that an employee is protected from discharge for good faith reporting of what the employee believes to be patient mistreatment). Here, plaintiffs make no assertion that, irrespective of the merits of their belief, they acted under a good faith belief that Dixson was impersonating a police officer while he was employed by defendant.

below, we conclude that none of the court's rulings is reversible error.

■ The second assignment of error involves proffered expert testimony concerning the standards for conducting a background check for a law enforcement officer and for investigating discrepancies in DPSST numbers. The evidence might relate to the adequacy of Dexheimer's check of Dixson's background[8] or to whether plaintiffs followed proper investigative techniques, but for the reasons we previously described those are not issues in the case. None of the evidence is relevant to whether Dixson committed the crime of impersonating an officer.

The third assignment of error involves the trial court's exclusion of Shidler's shift report from the shift during which he received the call from Kramer. The shift report contained Shidler's summary of what Kramer told him about Dixson's actions at the two Mollala taverns, information that was not otherwise in evidence. Plaintiffs assert that the report would be relevant to Shidler's state of mind and to the reasons for his investigation. They do not assert that it was information that plaintiffs intended to investigate themselves. Its admission, thus, would not tend to show that plaintiffs were performing an important public duty, and any error was harmless.

The fourth assignment involves one of Dixson's shift reports in which he may have used the 442 number. That issue is not relevant to whether he violated ORS 162.365 by impersonating an officer.

Plaintiffs' fifth assignment of error challenges the trial court's refusal to admit Dixson's entire personnel file. Many items in the file were otherwise in evidence, and the trial court held that the rest of the items were inadmissible because they were either hearsay or unfairly prejudicial. Plaintiffs seem to agree that some portions of the file were inadmissible but argue that the "judge could have easily

---

[8] At times, plaintiffs seem to argue that they were investigating Dexheimer's alleged favoritism towards Dixson, as shown in part by Dexheimer's overlooking things that Dixson did wrong. That is not, however, what they pleaded or attempted to prove.

redacted any other portions of Dixson's personnel file deemed prejudicial." However, it was plaintiffs' job to separate the admissible and inadmissible portions, something that they did not do. At least for that reason, the trial court did not err in rejecting the evidence. *Pumpelly v. Reeves*, 273 Or 808, 812-13, 543 P2d 682 (1975); *State v. Ryel*, 182 Or App 423, 431-33, 51 P3d 8 (2002), *rev den*, 335 Or 255 (2003).

Finally, in their sixth assignment of error, plaintiffs assert that the trial court should have admitted Kramer's report of his investigation of Dixson's actions or evidence from either Kramer or Shidler concerning what Kramer told Shidler about those actions. The report of the investigation contained hearsay in addition to what Kramer had told Shidler, and plaintiffs did not attempt to redact it. It was not error to reject that report. Any error in refusing to admit evidence of what Kramer told Shidler was harmless for the same reason that the court's refusal to admit Shidler's shift report containing that information was harmless. Plaintiffs did not investigate the conduct in issue, and their knowledge of it would not show that the misconduct that they did investigate constituted a criminal violation.

Affirmed.