Argued and submitted September 17, 2014, reversed and remanded
December 23, 2015

## WASHINGTON FEDERAL
## SAVINGS AND LOAN,
a corporation organized and existing
under the laws of the United States,
*Plaintiff-Respondent,*

*v.*

### Samson Y. CHEUNG,
an individual,
*Defendant-Appellant.*

Multnomah County Circuit Court
120201963; A154255

365 P3d 652

David R. Nepom argued the cause and filed the briefs for appellant.

John Thomas argued the cause for respondent. With him on the brief was RCO Legal, P.S.

Before DeVore, Presiding Judge, and Ortega, Judge, and Garrett, Judge.*

GARRETT, J.

---

* Ortega, J., *vice* Haselton, C. J.

**GARRETT, J.**

Defendant appeals a general judgment and money award to plaintiff in the amount of $3,459,078.55. Plaintiff, a bank, lent money to an Oregon construction company for the construction of homes. Defendant personally guaranteed the loan. After a default, plaintiff foreclosed on the properties and sold them at a trustee's sale. Plaintiff then sued defendant for the deficiency—the difference between the amount of the loan and the amount that plaintiff received from the sale of the properties. Defendant raised, as an affirmative defense, that he is entitled to a credit against the deficiency in the amount of the sales price of the properties or the "fair value" of the properties, whichever is greater. The case went to a jury on the limited issue of the fair value of the properties. The jury found that the fair value was $2.6 million. The trial court's judgment and money award to plaintiff thus reflects the amount of the loan less the $2.6 million credit.

On appeal, in four assignments of error, defendant argues that the trial court erred in (1) denying defendant's motion for directed verdict; (2) admitting settlement communications into evidence; (3) admitting evidence that was irrelevant to proving the fair value of the properties; and (4) failing to instruct the jury that plaintiff bore the burden of proof.

As explained below, we reject defendant's contention that he was entitled to a directed verdict or a dismissal of plaintiff's claim. We also conclude, however, that the trial court erroneously admitted three exhibits comprising settlement communications within the meaning of OEC 408. We further conclude that that error likely prejudiced defendant by coloring the jury's assessment of the fair value of the properties. Accordingly, we reverse and remand for a new trial. In light of that disposition, we need not resolve defendant's last assignment of error concerning the allocation of the burden of proof.

The relevant facts are undisputed. Plaintiff loaned money to an Oregon corporation to build homes in Clark County, Washington. The loan was secured by a trust deed, and defendant, an associate of the corporation, personally guaranteed the corporation's loans to build the homes.

Ultimately, the loan went into default, and plaintiff foreclosed on the constructed properties. At a trustee's sale in December 2011, plaintiff purchased the foreclosed properties for $2.6 million.

Plaintiff then sued defendant in Oregon[1] for the balance of the loan and was granted summary judgment as to (1) defendant's breach of the guaranty and (2) plaintiff's entitlement to a deficiency judgment against defendant for $5,746,879.29 (the loan balance owed as of the date of summary judgment) minus the fair value of the properties or the price paid at the trustee's sale (whichever is greater), plus an additional $285,976.76 in accrued interest, and $26,222.50 in costs and attorneys fees. Defendant's answer asserted an affirmative defense under Revised Code of Washington (RCW) 61.24.100(5). That Washington statute, in defendant's view, provides for a credit against a loan deficiency in the amount of the sales price of the properties or the fair value of the properties, whichever is greater.[2] The parties proceeded to trial for a jury to determine the "fair value" of the properties.[3]

---

[1] The terms of the guaranty agreement indicate that the parties agreed to settle any legal disputes under Oregon law in Oregon courts. At trial, however, the parties evidently agreed that the question of fair value was to be determined pursuant to Washington law. Similarly, on appeal, both parties appear to take for granted that Washington law applies to this dispute. As neither party addresses that issue, and because the trial court presumed that Washington law applies, we do also.

[2] RCW 61.24.100(5) provides, in relevant part:

"In any action against a guarantor following a trustee's sale under a deed of trust securing a commercial loan, the guarantor may request the court or other appropriate adjudicator to determine, or the court or other appropriate adjudicator may in its discretion determine, the fair value of the property sold at the sale and the deficiency judgment against the guarantor shall be for an amount equal to the sum of the total amount owed to the beneficiary by the guarantor as of the date of the trustee's sale, less the fair value of the property sold at the trustee's sale or the sale price paid at the trustee's sale, whichever is greater, plus interest on the amount of the deficiency from the date of the trustee's sale at the rate provided in the guaranty, the deed of trust, or in any other contracts evidencing the debt secured by the deed of trust, as applicable, and any costs, expenses, and fees that are provided for in any contract evidencing the guarantor's liability for such a judgment."

[3] RCW 61.24.005(6) defines "fair value" as follows:

"'Fair value' means the value of the property encumbered by a deed of trust that is sold pursuant to a trustee's sale. This value shall be determined by the court or other appropriate adjudicator by reference to the most probable price, as of the date of the trustee's sale, which would be paid in cash or

At trial, both plaintiff and defendant offered expert testimony as to fair value. Plaintiff also offered five exhibits as evidence of "market conditions" to prove the fair value of the encumbered properties at the time of the trustee's sale. Exhibit 1 is a copy of the deed, which shows that the properties were sold at the trustee's sale for $2.6 million. Exhibit 2 is a "Summary Appraisal Report" of the properties from October 2011. The appraisal reflects several distinct valuations of the properties under varying circumstances, including (1) a cost approach, valuing the 29 homes at $4,941,500.00; (2) a sales comparable approach, $3,938,100.00; (3) an aggregate gross retail value of $3,943,000.00; (4) a wholesale market value of $2,850,000.00; and (5) a 90-day liquidation value of $2,360,000.00.

Exhibit 3 is a September 2011 letter from Stevenson, an agent for defendant, to Hobin, plaintiff's senior vice president. The letter states, in relevant part, as follows:

"I'm sure you understand that [defendant] has no control over the amount prospective investors offer for the * * * properties. With the amount of foreclosed properties on the market, investors have a wide selection to choose from to make the best deal. Finding investors who have the capacity to close multi-million dollar cash offers is difficult, and those offers should be taken seriously.

"The investors have made their own determination what these properties are worth and their position has not changed. The groups are not willing to increase their original offer above $2.5 million on each of the properties. However, [defendant] would be willing to increase the deficiency amount to $1.75 million to make this offer work. The decision the bank needs to make is at what point is it better to cut your losses, get these loans off the books and move forward vs. foreclosing on all these properties and incurring the significant time and expense required to manage and maintain these properties before putting them back on an already depressed market for resale. The best you could expect in selling the Portland properties in a depressed

other immediately available funds, after deduction of prior liens and encumbrances with interest to the date of the trustee's sale, for which the property would sell on such date after reasonable exposure in the market under conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress."

market would be at a discount of 15%- 20% resulting in a loss of $750,000 to $1 million. If that assumption is correct, the current investor offer of $5 million plus [defendant's] deficiency of $1.75 million is very reasonable and would net the bank a similar amount without the protracted time and cost of a foreclosure.

"[Defendant] doesn't have many options left. If the bank won't accept this· offer, bankruptcy is a real possibility. [Defendant] would prefer to build his way out of this situation and pay down the deficiency with help from [plaintiff]. It's not in [plaintiff's] best interest to see [defendant] forced out of business. Please, let's try to get this resolved and avoid a lengthy and costly foreclosure that will only result in greater losses for both parties."

Exhibit 4 is a "Short Sale Approval Letter" from plaintiff to defendant, detailing the plaintiff's offer to buy the encumbered properties for a sales price of $2.49 million and requiring defendant to sign a deficiency note in the amount of $1.5 million.

Exhibit 5 is a series of emails between Stevenson and Hobin discussing possible offers on the encumbered properties. The series begins with an email from Stevenson to Hobin regarding a letter of interest (LOI) from a potential buyer on December 15, 2011. Later that day, Hobin replied:

"As I told [defendant] our bid at sale will be $[2,600,000] so I am sure we will need to be closer to that number and as we have discussed we cannot consider an offer without addressing the deficiency. Please submit a plan for the deficiency and I will provide a response to both the LOI and repayment of the deficiency."

Stevenson replied to Hobin the next day and copied defendant on the email:

"What we have on the table is a LOI for $2.3 million cash to be closed by 12/30/11. [Defendant] would agree to a $1.7 million deficiency with no interest, no payments for 3 years, interest only payments at 2% the fourth and fifth years and due after 5 years. The plan to pay back the deficiency would include partial payments to [plaintiff] on every future home sale assuming the market has recovered after 3 years, and would require participation with

[plaintiff] to provide construction financing on a case by case basis."

Hobin replied that plaintiff had "reviewed the offer[,]" was "declining the request with no counter offer[,]" and informed Stevenson that "[t]he Sale will proceed on 12/30/11 with a bid price of [$2.6 million]."

The final email was from Stevenson to Hobin, again copying defendant, on December 29, the day before the bank purchased the properties at a trustee's sale:

"Just so there is no misunderstanding because we are at the 11th hour, can you please confirm the *** LOI to purchase [the properties] for $2.494 million with due diligence and 60 day closing (they are already approved and have a term sheet/commitment letter from [another] bank for the purchase), and [defendant] agreeing to a $1.5 million deficiency with no interest, no payments for 3 years, interest only payments at 2% the fourth and fifth years and due in 5 years, was not acceptable to [plaintiff] to delay the foreclosure scheduled for tomorrow 12/30/11?"

Defendant objected to the admission of Exhibits 1, 2, 3, 4, and 5. Defendant argued that none of them was relevant because they were not probative of "fair value" as of the date of the trustee's sale. Defendant also argued that they were hearsay. As to Exhibits 3, 4, and 5, defendant also objected that they were inadmissible settlement communications under OEC 408. Plaintiff argued that all five exhibits were relevant to prove the fair value of the properties and that they were all admissible under the business-records exception to the hearsay rule. In response to defendant's OEC 408 argument, plaintiff argued that Exhibits 3, 4, and 5 were relevant to show market conditions.

The trial court admitted all of the exhibits. The court first concluded that Exhibits 1 and 2 were relevant evidence of fair value and admissible business records. The court then concluded that Exhibit 3 was admissible because it was "really addressing market conditions" that "fall[] within what should be looked at to determine fair value." The trial court next agreed with plaintiff that the "sales price *** [of] two point five million" contained in Exhibit 4 was admissible to prove the fair value of the properties.

Finally, the trial court agreed with plaintiff that Exhibit 5 contained offers to buy the properties and that that the offers "come[] in as part of the market conditions[.]" However, the trial court also offered to allow defendant to redact any portion of the exhibits "that essentially create[] unfair prejudice or confusion of the issues, or is for some other way * * * improper[.]" Defendant responded that redaction would not help because the properties' values reflected in the three exhibits were inextricably intertwined with comprehensive offers to settle.

At the close of evidence, defendant moved for a directed verdict, arguing that "[t]he only evidence is in the Defense case, and as of the close of [plaintiff's] case there's no evidence from which the jury could find without speculation the fair value of the propert[ies]." The court denied the motion.

The jury concluded that the "fair value" of the properties was $2.6 million. The court entered a general judgment and money award that specified that the principal balance of the loan was $5,746,879.29; that the accrued interest was $285,976.76; and that the total of attorney fees and costs amounted to $26,222.50. The judgment and money award also reflected that, after reducing the sum total of those figures by the jury's $2.6 million figure, defendant owed plaintiff $3,459,078.55. Defendant appeals that judgment and money award.

On appeal, defendant first argues that he was entitled to a directed verdict or dismissal of plaintiff's claim because plaintiff offered no evidence from which the jury could find the fair value of the properties. Rather, defendant contends that he presented "the only substantive evidence" of fair value. We review the denial of a motion for a directed verdict "for any evidence to support the jury's verdict, viewing the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party[.]" *Employers Insurance of Wausau v. Tektronix, Inc.*, 211 Or App 485, 494, 156 P3d 105 (2007). In reviewing a motion for directed verdict, "the verdict cannot be set aside 'unless we can affirmatively say that there is *no evidence* from which the jury could have found the facts necessary' to support the

verdict." *Pereira v. Thompson*, 230 Or App 640, 664, 217 P3d 236 (2009) (citing *Brown v. J.C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984)) (emphasis added).

Here, plaintiff offered evidence from which the jury could reach a determination of fair value, even if none of those exhibits is itself dispositive of fair value. Defendant's argument to the contrary, as we understand it, is based on the assumption that several of plaintiff's exhibits were erroneously admitted and, therefore, should be excluded from our analysis of whether plaintiff carried its burden. As explained further below, we agree with defendant's evidentiary arguments, in part. In reviewing the denial of a defendant's motion for a directed verdict, however, we cannot exclude evidence that we conclude should not have been admitted. *See Menke v. Bruce*, 88 Or App 107, 109, 744 P2d 291 (1987) (reviewing a motion for a directed verdict "in light of the whole record"); *Brown/Shidler v. Board of Education*, 207 Or App 163, 168, 139 P3d 1048 (2006) ("We review a grant of a directed verdict * * * viewing *all of the evidence* most favorably to plaintiffs." (Emphasis added.)); *Pacificorp v. Union Pacific Railroad*, 118 Or App 712, 715, 848 P2d 1249 (1993) ("Our review requires us to determine whether there is a complete absence of proof on an essential issue." (Citation and quotation marks omitted.)). Thus, we conclude that the trial court did not err in denying defendant's motion for a directed verdict.

Defendant next contends that the trial court erred in admitting Exhibits 3, 4, and 5 because they were settlement communications not relevant for any other purpose. Defendant's view is that the communications between Stevenson and Robin reflected in Exhibits 3 and 5, and the "short sale" offer reflected in Exhibit 4, were inadmissible under OEC 408 because they were "package deals made to compromise the entirety of plaintiff's claim."

Plaintiff, for its part, does not dispute that the exhibits in question are settlement communications. Rather, plaintiff takes the position that they were admissible for another purpose, namely, "to show the market conditions and the amounts potential purchasers were willing to pay for the propert[ies] in the months leading up to the trustee's sale."

OEC 408[4] bars evidence of settlement offers for the purposes of proving "liability for or invalidity of [a] claim or its amount." *See* OEC 408(1)(a), (b). The text of the rule, however, does not require the exclusion of evidence of settlement offers that are offered for another purpose. *See* OEC 408(2)(b).

Prior to the adoption of OEC 408 in 1981, evidence of compromise or negotiations was governed by the common-law principle that "an admission of fact made in the course of compromise negotiations is not protected unless it is hypothetical or is expressly stated to be 'without prejudice,' or is so inseparably connected with the offer that it cannot be correctly understood without reading the two together." Legislative Commentary to OEC 408, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 408.02, Art IV (4th ed 2002). Recognizing that the "inevitable effect[s]" of the common-law rule were to "inhibit freedom of communication with respect to compromise, even among lawyers" and "to generate controversy whether a negotiating statement is protected or not[,]" the legislature enacted OEC 408, modeled on Rule 408 of the Federal Rules of Evidence. *See Cyberco Holdings, Inc. v. Con-Way Transportation*, 212 Or App 576, 588, 159 P3d 359 (2007) (OEC 408 "is based on Rule 408 of the Federal Rules of Evidence"); *see also* Legislative Commentary to OEC 408, *reprinted in* Kirkpatrick, *Oregon Evidence* § 408.02, Art IV. The "broad purpose" in adopting OEC 408 was to "insure that frank and open negotiations will take place without fear that what is said during negotiations will be used against the parties at trial." *Id.*

---

[4] OEC 408 provides:

"(1)(a) Evidence of furnishing or offering or promising to furnish, or accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

"(b) Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

"(2)(a) Subsection (1) of this section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

"(b) Subsection (1) of this section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

In this case, as noted, there is no dispute as to whether the exhibits constitute settlement communications. The question, therefore, is whether the exhibits were offered to prove the "amount" of plaintiff's claim, in which case they are inadmissible, or whether, as plaintiff insists, they were offered for "another purpose."

Considering the three challenged exhibits in light of OEC 408's text and purposes, we fail to see how the exhibits were relevant to anything *other* than the amount of the claim. Exhibits 3 and 5 contain references to proposed offers from third parties to buy the properties from defendant, embedded within defendant's offers to settle his dispute with plaintiff. Exhibit 4 describes the bank's offer to buy the encumbered property from defendant, contingent upon defendant's signing of a deficiency note. Plaintiff argued below, and the trial court appeared to agree, that the evidence was relevant to show "market conditions." Accepting that statement at face value, the evidence was thus offered to show the price that could be obtained for the properties under prevailing market conditions, which was relevant to show (and only to show) the "fair value" of the properties. Put differently, we do not understand for what purpose plaintiff would have wanted to demonstrate "market conditions" except to illustrate the value of the properties, and thus (indirectly) the balance of defendant's debt.[5] Because the settlement communications were offered for the purpose of calculating the amount of plaintiff's claim against defendant, they should not have been admitted.

We thus conclude that the trial court erred in admitting Exhibits 3, 4, and 5.[6] We next consider whether defendant was prejudiced by the error, and, if so, whether reversal

[5] Plaintiff cites *Bdwy. Finance, Inc. v. Tadorovich*, 216 Or 475, 478, 339 P2d 436 (1959), to support its argument that the exhibits were properly admitted as "admissions of particular facts made in negotiation for compromise"—the particular facts being evidence of market value. *Id.* (internal quotation marks omitted; citations omitted). That case, however, was based on the common-law rule—allowing for admissions of fact made during compromise to be admitted—that was displaced by the legislature's enactment of OEC 408. Upon enactment of OEC 408, "evidence of conduct or statements made in compromise negotiations," as well as the offer or completed compromise itself, is not admissible.

[6] The fact that defendant declined the opportunity to redact the settlement communications does not change our analysis, because plaintiff has not demonstrated, nor are we persuaded, that any portion of the exhibits was admissible.

is required. Evidentiary error is not presumed to be prejudicial. OEC 103. An appellate court "lacks authority to modify a judgment based on evidentiary error without a determination that the error substantially affected the rights of the party—*i.e.,* that the error was 'prejudicial.'" *York v. Bailey,* 159 Or App 341, 347, 976 P2d 1181 (1999) (internal citations omitted). Evidentiary errors "substantially affect a party's rights and require reversal when the error has some likelihood of affecting the jury's verdict." *Dew v. Bay Area Health District,* 248 Or App 244, 258, 278 P3d 20 (2012).

Here, we conclude that the erroneous admission of Exhibits 3, 4, and 5 was prejudicial and requires reversal because there is at least "some likelihood" that their admission affected the jury's verdict. Plaintiff's expert's testimony focused on the contents of those exhibits. Defendant also called an expert witness to discuss defendant's respective exhibits. Because the jury's decision as to the fair value of the properties likely relied heavily on its evaluation of the experts and the information supporting their testimony, it follows that the admission of the challenged exhibits likely affected the jury's verdict. For those reasons, their erroneous admission requires reversal.

Because it may be pertinent on remand, we also address defendant's challenge to the admission of Exhibit 2. Defendant contends that Exhibit 2, the "Summary Appraisal Report," reflecting several distinct valuations of the properties, is irrelevant because it does "not purport to give an estimate of the fair value of the propert[ies]." Although it is true that the document does not include a figure that is denominated "fair value," that does not mean that the document is irrelevant to that issue. Under OEC 401, "relevant" evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, Exhibit 2 reflects several different values as of October 2011, two months before the trustee's sale. Defendant has presented no argument that those values are inaccurate or unreliable on their own terms. None of those values may be dispositive of "fair value," but that does not mean that they are not relevant data that a rational

factfinder might consider in determining fair value. Thus, Exhibit 2 is relevant, and the trial court correctly admitted it into evidence.

In sum, we conclude that the trial court did not err in denying defendant's motion for directed verdict because plaintiff offered evidence that supports the jury's verdict. However, the erroneous admission of Exhibits 3, 4, and 5 was prejudicial and requires a remand for a new trial.

Reversed and remanded.